Honorable John C. Coughenour

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

PERKUMPULAN INVESTOR CRISIS
CENTER DRESSEL — WBG,

                    Plaintiff,

          v.

REGAL FINANCIAL BANCORP, INC., *et al.*,

                    Defendants.

C09-1786-JCC

**ORDER**

     This matter comes before the Court upon the separate motions to dismiss of several different defendants. (Dkt. Nos. 85, 96, 98, 99 & 110). In addition to Defendants' motions, the Court has considered Plaintiff's responses to those motions (Dkt. Nos. 105, 123, 125, 127 & 129), and Defendants' replies thereto. (Dkt. Nos. 112, 135, 136, 137 & 138). Having therefore reviewed the record, the Court has determined that oral argument is unnecessary. For the reasons explained below, the Court hereby GRANTS the motion of Defendants Brian Hill and Kevin Hylton (Dkt. No. 85), and DENIES the motions of the remaining defendants.

1   **I.      FACTUAL ALLEGATIONS**

2           This case sounds in allegations of international financial fraud.[1] Plaintiff is an association of

3   thousands of Indonesian investors who allege that Defendants defrauded them of hundreds of millions of

4   dollars. Defendants were the operators of the now-defunct Dressel Investment Limited, a company

5   which Defendants describe as a legitimate investment enterprise which failed, but which Plaintiff

6   describes as a classic Ponzi scheme. According to Plaintiff, Defendants represented to Indonesian

7   investors that Dressel principals were investment professionals capable of delivering annual returns of

8   between twenty-four and twenty-eight percent. Because of these representations, Plaintiff alleges,

9   thousands of Indonesian investors trusted Defendants with relatively small fortunes of tens of thousands

10  of dollars each. Finally, Plaintiff alleges that Defendants never properly invested the money with which

11  they had been entrusted, but in fact used the contributions from newer investors to make payments to

12  earlier investors, thereby operating a classic Ponzi scheme. Many investors lost their life savings.

13  (Complaint 20–24 (Dkt. No. 1)).

14

15          [1]The Court has seen this case before: In October 2009, the Court dismissed Plaintiff's complaint in Cause Number
    C09-0526-JCC, having concluded that Plaintiff lacked constitutional standing to pursue the claims of the real parties in
16  interest—the aggrieved Indonesian investors. The Court described its legal analysis as "hinging on a single point: Plaintiff has
    failed to plead any facts whatsoever that tend to establish that it represents the people it purports to represent." (Order 10,
17  Cause No. C09-0526 (Dkt. No. 113)). This Court was therefore unable to guarantee itself that a potential judgment would
    provide redress to the actually aggrieved victims. As the Court's order stated, "[T]his Court has no way of knowing that
18  Perkumpulan's 'neutral rules of distribution,' *which it has failed to describe in any detail whatsoever*, will provide redress to
    the alleged victims." (*Id.* 13) (emphasis in original). The Court therefore dismissed the case without prejudice. That judgment
19  was recently affirmed by the United States Court of Appeals for the Ninth Circuit. (Memorandum Opinion, Cause No. C09-
    0526-JCC (Dkt. No. 122)).
            Plaintiff thereafter commenced *this* case, which is Cause Number C09-1786-JCC. Plaintiff commenced this case
20  after the Supreme Court issued a landmark opinion on the law of assignee standing, *Sprint Communications Company v.
    APCC Services*, 554 U.S. 269 (2008). The Supreme Court fundamentally altered the law of assignee standing by holding that
21  the owner of a legal claim may assign the claim to a third party, and that the third party thereafter enjoys the right to invoke
    the jurisdiction of the United States courts in his or her own name. As the Supreme Court stated, "Lawsuits by assignees,
22  including assignees for collection only, are cases and controversies of the sort traditionally amenable to, and resolved by, the
    judicial process." *See id.* at 285 (internal markings omitted). The principles announced in *Sprint Communications* changed the
23  law of constitutional standing, and they also changed the law of this case.
            In May 2010, this Court denied Defendants' motion to dismiss for lack of subject-matter jurisdiction, finding that
24  *Sprint Communications* required a different outcome than the outcome of the previous case. As this Court stated, "Because
    the investors assigned their claims to Plaintiff 'lock, stock and barrel,' *Sprint*, 554 U.S. at 286, and because Plaintiff 'has a
25  contractual obligation to litigate in the [investors'] interest,' *id.* at 288, this case is on all fours with *Sprint*. Plaintiff therefore
    enjoys assignee standing." (Order 5–6 (Dkt. No. 84)).

26  ORDER, C09-1786-JCC
    Page 2

1   Plaintiffs allege that Defendants' representations about Dressel Investment were lies, and that

2   Defendants never invested the Indonesian clients' money in legitimate profit-making enterprises.

3   Instead, they used the money to launch and fund their own businesses and to purchase, for example,

4   helicopters for themselves. (*Id.* 36–38). Defendants also allegedly lied about their own qualifications:

5   For example, Defendant Donald Sherer represented himself as being an investment professional when

6   he was in fact a disbarred attorney who had been reduced to making his living by driving busloads of

7   Utah State residents into Nevada State for weekend gambling excursions. (*Id.* 26).

8   **A.     Defendants**

9   Plaintiff's complaint describes three broad categories of defendants, each of which played a

10   distinct role in the scheme to defraud. First, Danny Wong, Frank Ho and Joseph Yau led operations

11   from Asia, where they lived during the time at issue. The three Asian defendants also attended

12   presentations in Indonesia, at which attendees were induced to invest in the Ponzi scheme. (*Id.* 5–7).

13   Second, Dwight Williams, David Thacker, Kelly Thacker, Donald Sherer, Michelle Sherer and Kenneth

14   McCabe ran the day-to-day operations of the scheme from Utah State, where they lived during the time

15   at issue. Many of the Utah defendants also conducted presentations in Indonesia with potential

16   investors. (*Id.* 7–13). Finally, Regal Financial Bank and Jesse Tam, the bank's founder and chief

17   executive officer, provided financial and other material support for the scheme from Washington State.

18   Several directors of Regal Financial Bank have also been named as defendants. Danny Wong, one of the

19   Asian defendants, was also a major shareholder of Regal Financial Bank. (*Id.* 13–16).

20   **B.     Presentations**

21   Plaintiff's complaint describes four separate presentations at which Defendants convinced

22   Indonesian individuals to invest in Dressel. (*Id.* 26–29). The first meeting occurred in May 2001 at the

23   Grand Hyatt Hotel in Jakarta, Indonesia, and was led by Defendant Donald Sherer and Defendant Joseph

24   Yau. Sherer allegedly represented that the firm was negotiating a fifteen-year tax holiday with the

25

26   ORDER, C09-1786-JCC
     Page 3

Government of the Cayman Holidays, when in fact no such negotiations were ongoing. Plaintiff alleges that Sherer also misrepresented his own qualifications and the qualifications of other members of the Dressel organization: He allegedly told potential investors that he was an investment professional when he was in fact a disbarred attorney who earned a living by driving busloads of gamblers from Utah State to Nevada State for weekend excursions. Sherer also allegedly told potential investors that Yau had terminated a lucrative career as an investment banker and affiliated himself with Dressel because Yau "wanted to do something on his own." (*Id.* 26). In fact, Yau had joined Dressel after being publicly censured by Hong Kong financial authorities. Neither Sherer nor Yau mentioned this public censure. (*Id.* 26–27).

The second meeting occurred in September 2001, and was also attended by Sherer and Yau. Sherer allegedly falsely represented to potential investors that he had years of experience working in foreign exchanges and that he had taught financial management. (*Id.* 27). Plaintiff alleges that Sherer and Yau also provided potential investors with brochures that described Dressel as offering "ethical and unbiased decision-making, aimed at client portfolio long-term enrichment." (*Id.* 30). The brochures introduced other defendants to potential investors, prominently describing Defendants Kenneth McCabe and Michele Sherer as financial professionals. In fact, Plaintiff alleges, neither had experience working in high finance. (*Id.* 30). The brochures also listed Defendant Dwight Williams as the company's attorney and Defendant Tanner LC as its accountant. Finally, the brochures also listed the account number and routing information of Dressel's bank account with Defendant Regal Financial Bank, where potential investors were told that they could wire their money. (*Id.*).

The third meeting occurred in June 2004 in the Hyatt Regency Hotel in Bandung, Indonesia. It was attended by Defendants Danny Wong, Dwight Williams, Donald Sherer and Michele Sherer. (*Id.* 28). The defendants allegedly promised investors annual returns of between twenty-four and twenty-eight percent, telling investors that Dressel's previous annual returns had averaged forty percent *per*

1   *annum.* (*Id.*). Plaintiff alleges that these representations were false. (*Id.*). Dressel brochures containing

2   similar misrepresentations were distributed to attendees. (*Id.*).

3        The fourth meeting occurred in July 2004 in Surabaya, Indonesia, and was attended by

4   Defendants Danny Wong, Dwight Williams and Donald Sherer. Potential investors were allegedly told

5   that Dressel used Defendant Regal Financial Bank as its bank in part because Dressel had an ownership

6   stake in the bank. Allegedly, they were also told that Dressel was "assisting the bank in its expansion to

7   Beijing, Guangzhou, Las Vegas, and other areas of the world." (*Id.* 28). Plaintiff alleges that Wong told

8   attendees that Dressel invested in companies throughout the world, including China, Japan and Europe,

9   when in fact no such global investments existed. Williams allegedly told attendees that the company

10  generally invested in publicly traded companies, when only one such investment actually existed. (*Id.*).

11  In fact, Plaintiff alleges, almost all of investors' funds were used to directly enrich Defendants or to fund

12  their own businesses.

13  **C.   Web Site**

14       Dressel launched a web site in February 2001 with the domain name of *www.dressel-inv.com*.[2]

15  The web site contained many of the same alleged misrepresentations which Defendants had made to

16  potential investors at the meetings in Indonesia. For example, it described Dressel as a legitimate

17  investment opportunity and misrepresented the qualifications of Donald Sherer and Michele Sherer.

18  (Complaint 31–34 (Dkt. No. 1)). The web site also allegedly stated that Defendant David Thacker had

19  "extensive experience with and understanding of mining issues," that Defendant Kenneth McCabe had

20  more than forty years of experience in the "marketing and administration of various financial products,"

21  and that McCabe had provided consulting services to several foreign governments on "economic and

22  _____

23      [2] Because the web site used an American domain name and because Dressel maintained offices in the United States, Plaintiff "reasonably expects" discovery to prove that the web site was published from the United States. (Complaint 31 (Dkt. No. 1)). Plaintiff's inference is entirely reasonable, and this Court accepts it as true for the purpose of this order. *See*

24  *Westinghouse Electric Corp. v. Newman & Holtzinger, P.C.*, 992 F.2d 932, 934 (9th Cir. 1993) (stating that a court confronted with a motion to dismiss for failure to state claim must "take the complaint's allegations of material fact as true *and construe them in the light most favorable to the nonmoving party*.") (emphasis added).

25

26

1  financial matters." (*Id.* 32). In fact, Plaintiff alleges that Thacker had no such experience in mining

2  operations, and that McCabe was a retired department manager from Sears Roebuck. (*Id.*).

3  The web site was allegedly changed in August 2005 to announce that Dressel had "chosen the

4  State of Washington as its North American hub," and that it had recently opened an office in downtown

5  Seattle. (*Id.* 32). The alleged changes also announced that Defendants David Thacker and Kelly Thacker

6  had been named to Dressel's board of directors. Finally, the web site was allegedly changed in

7  December 2005 to announce that Defendant Danny Wong had been made a member of Regal Financial

8  Bank's advisory board, and that Wong was a bank shareholder. (*Id.*).

9  **D.    Banking Defendants**

10  Defendant Regal Financial Bank was founded in 2001 and opened for business in 2002. The

11  bank was founded by Defendant Jesse Tam, who also served as the institution's chief executive officer.

12  (Complaint 13–14 (Dkt. No. 1)). Dressel opened accounts with the bank the same year that it opened.

13  (*Id.* 57). By 2004, Plaintiff alleges, Dressel accounts and other accounts controlled by Defendant Danny

14  Wong comprised approximately ten percent of the bank's deposits. (*Id.* 60). From 2004 until 2006,

15  Indonesian investors wired their funds directly to Regal Financial Bank. (*Id.* 42–46). In March 2006

16  alone, Regal Financial Bank allegedly received approximately one million dollars in wire transfers from

17  a bank in Indonesia. (*Id.* 58). Plaintiff alleges that Regal Financial Bank also maintained a banking

18  relationship with other defendants. For example, the bank allegedly provided a loan of one-hundred

19  thousand dollars to a company controlled by Defendant Donald Sherer in July 2004. (*Id.* 60).

20  In August 2004, in order to satisfy demands made by banking regulators, Regal Financial Bank

21  asked that Dressel provide it with copies of the company's annual financial statements and tax returns.

22  (*Id.* 38–39). Plaintiff alleges that Defendants Donald Sherer, Michele Sherer, David Thacker, Kelly

23  Thacker, Danny Wong and Dwight Williams met in Las Vegas, Nevada in August 2004 to discuss the

24  bank's request. At the meeting, they allegedly agreed to manipulate Dressel's books to create the

25

26  ORDER, C09-1786-JCC
    Page 6

appearance of legitimacy in order to satisfy banking regulators. (*Id.* 39). Allegedly, Kelly Thacker was charged with the task. In March 2005, she sent an email message to Dwight Williams, saying that she was "fine tuning" the company's profit-and-loss statements. In the same email message, she informed Williams that Donald Sherer and Michele Sherer had "perpetrated some kind of scam." (*Id.*). Williams sent an email message to Wong approximately one month later, telling Wong that several hundred thousand dollars had been accounted "off the books," and that Dressel's 2003 financial statements were still incomplete. In the same email message, Williams reminded Wong of his fiduciary responsibilities with respect to Dressel funds, and warned him that the criminal behavior of some Dressel principals could create criminal liability for other principals. (*Id.*). Regal Financial Bank had given Dressel until March 2005 to produce financial reports for the 2004 calendar year, but the company was unable to meet the deadline. As late as May 2005, Kelly Thacker sent an email message to David Thacker, Wong and Williams, saying that the company "could not give the accounts to an auditor the way that they stand right now." (*Id.* 40). Despite the problems, Plaintiff alleges, Regal Financial Bank maintained its relationship with Dressel. (*Id.*).

Regal Financial Bank and Jesse Tam also maintained a relationship with Danny Wong that extended beyond banking services, Plaintiff alleges. Wong was a bank shareholder and served on the bank's advisory board. (*Id.* 59). In early 2004, Tam provided Wong with a letter of recommendation that described Wong as a "valued client and shareholder of Regal Financial Bank." (*Id.* 58). The letter praised Wong as a community leader. It concluded: "Regal Financial Bank values Mr. Wong's relationship and supports his endeavors, not only as a bank customer and shareholder, but also for his contributions toward cultural enrichment." (*Id.* 58–59). Finally, in May 2006, Tam allegedly traveled with Wong to Jakarta, Indonesia, where they both discussed Dressel's business relationships and future development with investors. (*Id.* 60).

//

**E.      Financial Collapse**

By September 2006, Dressel had stopped making payments to investors and the alleged Ponzi scheme had begun to unravel. A group of Indonesian investors visited Seattle in November 2006. Danny Wong and other defendants allegedly provided them with assurances that the company was financially sound. (Complaint 47 (Dkt. No. 1)). Wong made similar representations in a letter which he mailed in November 2006, stating that Dressel was "functioning well," and promising that investors' funds were "in good hands." (*Id.*). In the letter, Wong explained that the suspended payments, which he described as "slight delays on Dressel's contractual obligations toward [its] clients," were attributable to an "unanticipated competitive environment and seasonal holidays in October." (*Id.*). Wong ended the letter by reminding investors about the visit he had made earlier in 2006 with Defendant Jesse Tam, which Wong said should inspire trust in investors. (*Id.* 48). In December 2006, Wong allegedly sent another letter to investors, stating that the company had "every intention of honoring [its] contractual obligations toward our clients with respect to their investments." (*Id.* 50). Plaintiff alleges that the company proved unable to meet those commitments, and the Indonesian investors lost those funds which they had contributed to Dressel.

**F.      Internal Problems at Dressel & Sham Lawsuits**

As early as 2005, Defendants had allegedly started to take steps to protect themselves from legal liability after the inevitable crash. Defendants Donald Sherer and Michele Sherer left the company, leaving it in the hands of Defendants David Thacker and Kelly Thacker. Plaintiff alleges that David Thacker and Kelly Thacker formed a separate organization called *Integrity Office Support*, purportedly to administer Dressel investment funds. (Complaint 41 (Dkt. No. 1)). While performing administrative duties for Dressel, David Thacker allegedly instructed an employee to forge his signature and the signature of Kenneth McCabe. (*Id.* 42). The same employee began to receive threatening phone calls from Indonesian investors in 2007, after Dressel had stopped making payments. The employee told

1  Kelly Thacker and Danny Wong that he had grown uncomfortable signing order-to-pay documents. In

2  an email message sent on February 8, 2007, Kelly Thacker allegedly told the employee to either sign the

3  documents or lose his job. Wong sent an email message to the employee on the same day, allegedly

4  telling him essentially the same thing. (*Id.* 42).

5        Also in 2005, Defendants David Thacker, Kelly Thacker, Danny Wong and Dwight Williams

6  formed the *Assert Recovery Trust* with the purported goal of recovering Dressel assets from Donald

7  Sherer and Michele Sherer. (*Id.* 52–54). They selected a former law partner of Williams to set up the

8  trust and to select a trust administrator. This administrator later averred that "he had come to believe that

9  [the trust] was actually set up to divert Dressel's assets, deceive investors, and to place the blame for the

10  collapse of Dressel on [Donald Sherer and Michele] Sherer." (*Id.* 54). The trust has been involved in

11  extensive litigation since its formation. It filed a lawsuit against Donald Sherer and Michele Sherer in

12  Utah State in 2005. It has also been named as a defendant in at least three lawsuits filed by Donald

13  Sherer and Michele Sherer. Purportedly, all of the lawsuits have been filed to protect the interest of

14  defrauded Indonesian investors. (*Id.* 57). The complaint alleges in part: "All of these pre-existing

15  lawsuits are tainted by the pre-existing associations of those involved." (*Id.*). It concludes: "There has

16  been an ongoing effort to deceive the Dressel investors into believing that their rights were being

17  legitimately advocated in the United States. None of these existing suits represents a good-faith effort to

18  recover the stolen assets." (*Id.*).

19  **II.    PLEADING REQUIREMENTS**

20        The Federal Rules of Civil Procedure provide that a plaintiff adequately pleads his or her claim

21  by stating nothing more than "a short and plain statement of the claim showing that the pleader is

22  entitled to relief[.]" FED. R. CIV. P. 8(a)(2). The Supreme Court has explained that this requirement is

23  intended to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it

24  rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (quoted with approval in *Bell Atlantic Corp. v.*

25

26  ORDER, C09-1786-JCC
    Page 9

1  *Twombly*, 550 U.S. 544, 555 (2007)). This is not to say that a complaint is adequate if it offers nothing

2  more than "labels and conclusions," or a "formulaic recitation of the elements of a cause of action."

3  *Twombly*, 550 U.S. at 555. The Supreme Court has stated that a complaint must "contain sufficient

4  factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*,

5  -- U.S. --, --, 129 S.Ct. 1937, 1949 (2009). The Court clarified the standard: "A claim has factual

6  plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

7  inference that the defendant is liable for the misconduct alleged." *Id.* at 1949.

8  **A.  Allegations of Fraud**

9  The Federal Rules of Civil Procedure impose a heightened pleading requirement on those

10  plaintiffs who allege that a defendant has engaged in fraud. As Rule 9 provides: "In alleging fraud or

11  mistake, a party must state with particularity the circumstances constituting fraud or mistake." FED. R.

12  CIV. P. 9(b). The Ninth Circuit has interpreted this particularity requirement as requiring that a plaintiff

13  "state the time, place, and specific content of the false representations as well as the identities of the

14  parties to the misrepresentation." *Odom v. Microsoft Corp.*, 486 F.3d 541, 553 (9th Cir. 2007); *see also*

15  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 ("Averments of fraud must be accompanied by 'the

16  who, what, when, where, and how' of the misconduct charged."). This particularity requirement extends

17  only to the factual circumstances surrounding the fraudulent behavior itself: "The state of mind—or

18  *scienter*—of the defendant may be alleged generally." *Odom*, 486 F.3d at 554. This heightened pleading

19  requirement applies to all claims that sound in fraud, which includes claims arising under the Racketeer

20  Influenced and Corrupt Organizations Act of 1970. *Lancaster Community Hospital v. Antelope Valley*

21  *Hospital District*, 940 F.2d 397, 405 (9th Cir. 1991). The heightened requirement also applies to claims

22  of conspiracy to defraud. *Wasco Products, Inc. v. Southwall Technologies, Inc.*, 435 F.3d 989, 991 (9th

23  Cir. 2006).

24  //

25

26

1     **III.     LEGAL STANDARD**

2            A defendant may challenge the sufficiency of the complaint's allegations by filing a motion to

3     dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6) of the Federal

4     Rules of Civil Procedure. WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL 3d § 1356

5     (2004) ("[T]he purpose of a motion under Federal Rule 12(b)(6) is to test the formal sufficiency of the

6     statement of the claim for relief; the motion is not a procedure for resolving a contest between the parties

7     about the facts or the substantive merits of the plaintiff's case."). When confronted with such a motion,

8     this Court confines its review to the four corners of the complaint, and to those exhibits attached to the

9     complaint which are of undisputed authenticity. *Farr v. United States*, 990 F.2d 451, 454 (9th Cir. 1993).

10    This Court assumes for the purposes of the motion that all factual allegations contained in the complaint

11    are true, and construes the complaint in the light most favorable to the plaintiff, drawing all reasonable

12    inferences in the plaintiff's favor. *National Audubon Society v. Davis*, 307 F.3d 835, 855 (9th Cir. 2002).

13           This Court examines all claims—other than claims sounding in fraud—against Rule 8's

14    requirement that a plaintiff provide a "short and plain statement of the claim showing that the pleader is

15    entitled to relief." *Iqbal*, 129 S.Ct. at 1949. A complaint survives the motion to dismiss if its "non-

16    conclusory factual content, and reasonable inferences from that content, [are] plausibly suggestive of a

17    claim entitling the plaintiff to relief." *Moss v. United States Secret Service*, 572 F.3d 962, 969 (9th Cir.

18    2009) (citing both *Twombly*, 550 U.S. at 556, and *Iqbal*, 129 S.Ct. at 1949).

19           This Court examines the adequacy of claims sounding in fraud against Rule 9's requirement that

20    a plaintiff "state with particularity the circumstances constituting fraud or mistake." *Odom*, 486 F.3d at

21    553. In order to survive the motion to dismiss, therefore, a complaint's allegations of fraud must do

22    more than plausibly state a claim entitling the plaintiff to relief. The complaint must sufficiently identify

23    the circumstances constituting fraud with such particularity "that the defendant can prepare an adequate

24    answer from the allegations." *Walling v. Beverly Enterprises*, 476 F.2d 393, 397 (9th Cir. 1973).

25

26

1    **IV.    OVERVIEW OF PLAINTIFF'S LEGAL CLAIMS**

2        Plaintiff states twelve separate claims for relief, each of them against different combinations of

3    defendants. Only the first ten are at issue in this order. Plaintiff's first six claims sound in alleged

4    violations of the Racketeer Influenced Corrupt Organizations Act (RICO), fraud, and breaches of

5    fiduciary duties. Plaintiff alleges that the Utah State and Asian defendants directly committed the

6    wrongful acts, and that Regal Financial Bank and Jesse Tam aided and abetted them in doing so.

7    (Complaint 62–83). Plaintiff's seventh claim is against all Defendants, and alleges that they conspired to

8    defraud the Indonesian investors of their money. (*Id.* 84–85). The eighth and ninth claims are against

9    Jesse Tam, Regal Financial Bank, and the bank's directors, and sound in allegations of negligent and

10   reckless bank supervision. (*Id.* 85–90). The tenth claim is against the Utah State and Asian defendants,

11   and sounds in unjust enrichment. (*Id.* 90).

12   **V.    RACKETEER INFLUENCED CORRUPT ORGANIZATIONS ACT OF 1970**

13       Defendants Regal Financial Bank and Jesse Tam argue that this Court must dismiss Plaintiff's

14   RICO claims against them for two separate reasons. First, they argue that Plaintiff has failed to plead

15   sufficient facts to plausibly demonstrate the existence of a conspiracy to engage in racketeering activity.

16   (Motion 21–32 (Dkt. No. 99)). Second, they argue that any violations were extraterritorial in nature and

17   therefore occurred beyond this Court's jurisdiction. (*Id.* 16–21). Both arguments fail. Defendants David

18   Thacker and Kelly Thacker argue that this Court must dismiss Plaintiff's RICO claims against them

19   because the complaint fails to allege that they committed any predicate criminal act or otherwise

20   engaged in racketeering activity. (Motion 2–14 (Dkt. No. 96)). This argument also fails.

21   **A.    Relevant Statutory Prohibitions**

22       The Racketeer Influenced Corrupt Organizations Act (RICO) broadly prohibits individuals from

23   associating with each other in order to engage in racketeering activities:

24   //

25

26   ORDER, C09-1786-JCC
     Page 12

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c).[3] To state a legally cognizable claim for relief under this particular provision of RICO, a plaintiff must allege that a defendant participated in the affairs of an "enterprise" through "a pattern of racketeering activity." *United States v. Fernandez*, 388 F.3d 1199, 1221 (9th Cir. 2004).

An "enterprise" is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Consistent with the congressional mandate that RICO's terms are to "liberally construed to effectuate its remedial purposes," the Supreme Court has interpreted the term "enterprise" as having a "broad reach," and extending to association-in-fact enterprises. *Boyle v. United States*, 129 S.Ct. 2237, 2243, 556 U.S. --, -- (2009). An "association-in-fact enterprise" has three structural features: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit those associated to pursue the enterprise's purpose." *Id.* at 2244.

A group of individuals who engage in a pattern of racketeering activity have not necessarily formed an enterprise-in-fact, as the enterprise must have an existence separate and apart from the racketeering activity itself. *United States v. Turkette*, 452 U.S. 576, 583 (1981). A plaintiff can successfully plead the existence of an enterprise-in-fact, however, by pleading facts that tend to show a pattern of racketeering activity, as the evidence establishing each "may in particular cases coalesce." *Boyle*, 129 S.Ct. at 2245 (quoting *Turkette*, 452 U.S. at 583). In addition to imposing liability on all

---

[3]Congress enacted the Racketeering and Corrupt Influence Organizations Act of 1970 in order combat the growing problem of organized crime and the corrupting influence of organized crime on American institutions. Expressly finding that organized criminal activities "weaken the stability of the nation's economic system, harm innocent investors and competing organizations, interfere with free competition, seriously burden interstate and foreign commerce, threaten the domestic security, and undermine the general welfare of the nation and its citizens," Congress passed the Act in order to "seek the eradication of organized crime in the United States by strengthening the legal tools in the evidence-gathering process, by establishing new penal prohibitions, and by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime." Pub. L. 91-452, 84 Stat. 922, 923 (1970).

1   participants of racketeering enterprises, RICO also expressly provides that "it shall be unlawful for any

2   person to conspire to [engage in racketeering activity]." 18 U.S.C. § 1962(d).

3       A "pattern of racketeering activity" is defined as requiring that an individual have committed

4   two or more predicate criminal acts within a ten-year period. *Id.* § 1961(5). The criminal predicate acts

5   must be related in some way: "Criminal conduct forms a pattern if it embraces criminal acts that have

6   the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are

7   interrelated by distinguishing characteristics and are not isolated events." *Sedima, S.P.R.L. v. Imrex co.,*

8   *Inc.*, 473 U.S. 479, 496 n.14 (1985).

9       Wire fraud is among the criminal acts that can trigger liability under the Act. *Id.* § 1961(1). The

10  federal wire-fraud statute prohibits a person from using a "wire, radio, or television communication in

11  interstate or foreign commerce" as part of a "scheme or artifice to defraud, or for obtaining money or

12  property by means of false or fraudulent pretenses, representations, or promises." *Id.* § 1343. To

13  successfully state a claim for wire fraud, a plaintiff must allege "(1) the formation of a scheme or artifice

14  to defraud; (2) use of the United States wires or causing a use of the United States wires in furtherance

15  of the scheme; and (3) specific intent to deceive or defraud." *Schreiber Distributing Co. v. Serv-Well*

16  *Furniture Co., Inc.*, 806 F.2d 1393, 1399–1400 (9th Cir. 1986). The wire communication itself need not

17  be fraudulent, so long as it is "either incident to an essential part of the scheme," or a "step in the plot."

18  *United States v. Rude*, 88 F.3d 1538, 1544 (9th Cir. 1996).

19      The wire-fraud statute extends to behavior that defrauds victims in foreign countries, so long as

20  the use of the communication wire occurs in the United States. In 2005, the Supreme Court upheld the

21  wire-fraud conviction of defendants who had used wire-communication technology while they were in

22  the United States in order to defraud a foreign government. *Pasquantino v. United States*, 544 U.S. 349

23  (2005). The Court expressly rejected the argument that such a prosecution was "extraterritorial" in

24  nature, stating that the defendants' "offense was complete the moment they executed the scheme inside

25

26  ORDER, C09-1786-JCC
    Page 14

1  the United States; the wire-fraud statute punishes the scheme, not its success." *Id.* at 371 (internal

2  markings omitted).[4]

3  **B.  Discussion**

4       Plaintiff successfully states a claim under RICO against Defendants Jesse Tam, Regal Financial

5  Bank, David Thacker and Kelly Thacker. Because Plaintiff states the claim with sufficient particularity

6  to allow Defendants to "prepare an adequate answer from the allegations," *see Odom v. Microsoft*, 486

7  F.3d at 553, Plaintiff's complaint satisfies the particularity requirement of Rule 9 of the Federal Rules of

8  Civil Procedure. The RICO claims against Jesse Tam, Regal Financial Bank, David Thacker and Kelly

9  Thacker therefore survive the motions to dismiss.

10       **i.  Enterprise-in-Fact**

11       Plaintiff's complaint alleges that Tam launched a bank in 2001, which he aligned immediately

12  thereafter with Danny Wong and the Dressel enterprise. By 2004, approximately ten percent of the

13  bank's deposits were in accounts affiliated with Wong and Dressel. Wong was more than a bank

14  customer: He was also a major shareholder and a member of the bank's advisory board, positions which

15  he allegedly used to bolster his credibility with potential Indonesian investors. Wong allegedly used his

16  relationship with Regal Financial Bank with the full knowledge of the bank's chief executive officer,

17  Jesse Tam. In fact, the complaint alleges that Wong had the chief executive officer's blessing: Tam

18  provided Wong with a letter of recommendation in 2004, stating that Regal Financial Bank valued

19  Wong "not only as a bank customer and shareholder, but also for his contributions toward cultural

20  enrichment." (Complaint 58–59 (Dkt. No. 1)).

21       Plaintiff's complaint also alleges facts tending to show that Regal Financial Bank and Tam acted

22  as more than bankers, and that they willfully ignored red flags that should have alerted the bank to

23

24       [4]Without deciding the issue, the Supreme Court also suggested in *dictum* that extraterritorial application of the wire-fraud statute would be appropriate: "In any event, the wire-fraud statute punishes frauds executed 'in interstate or foreign

25  commerce,' so this is surely not a statute in which Congress had only domestic concerns in mind." *Id.* at 371–72 (quoting the wire-fraud statute; other internal markings omitted).

26  ORDER, C09-1786-JCC
Page 15

1   problems with Dressel. For example, Tam traveled with Wong to Jakarta, Indonesia, in May 2006 to

2   discuss Dressel's "current investment situation, its business relationships and future development," (*Id.*

3   60), and Regal Financial Bank maintained a banking relationship with Dressel even after the company

4   had failed to provide necessary financial reports in a timely manner. (*Id.* 40).

5       The complaint alleges that David Thacker and Kelly Thacker aligned themselves with the

6   enterprise as early as 2004. At a meeting which was allegedly held in August 2004 in Las Vegas,

7   Nevada, Kelly Thacker assumed responsibility for manipulating Dressel's financial statements. David

8   Thacker also attended the meeting and participated in the decision. (*Id.* 39). Kelly Thacker thereafter

9   "fine tuned" the company's profit-and-loss statements in an alleged attempt to satisfy banking

10  regulators. (*Id.*). Finally, the complaint alleges that David Thacker and Kelly Thacker pressured a

11  Dressel employee to falsify signatures on improper order-to-pay documents. (*Id.* 42).

12      In short, Plaintiff has successfully alleged that Regal Financial Bank, Jesse Tam, Danny Wong,

13  David Thacker and Kelly Thacker (1) associated with each other for the (2) purpose of defrauding

14  Indonesian investors of their funds in order to enrich themselves, and (3) that they maintained the

15  relationship from the time that the Thackers affiliated themselves with Dressel in 2004 until the

16  enterprise finally folded in 2007. Plaintiff has therefore successfully alleged that Regal Financial Bank,

17  Tam, Wong, and the Thackers formed an enterprise-in-fact as defined under RICO. *See Boyle*, 129 S.Ct.

18  2244 (stating that the elements of enterprise-in-fact liability under RICO are (1) relationship, (2)

19  wrongful purpose, and (3) sufficient longevity").

20      **ii.     Predicate Criminal Acts**

21      The complaint describes an entire series of wire transfers that sent funds from Indonesia to Regal

22  Financial Bank in Seattle. These wire transfers include the names of the banks from which the funds

23  were sent, along with the amounts transferred. (*Id.* 42–46). Plaintiff alleges, for example, that "on

24  January 5, 2005, Hermin Indrawati wired fifty thousand dollars from Permata Bank in Surabaya,

25

26  ORDER, C09-1786-JCC
    Page 16

Indonesia to account number 180002784 at Regal Financial Bank." (*Id.* 43). Several additional wire transfers are described with similar particularity. Plaintiff therefore alleges that United States wires were used to transfer the very funds which Defendants allegedly stole from the Indonesian investors, which means that the wire transfers represent "an essential part of the scheme to defraud." *See Rude*, 88 F.3d at 1544. Finally, the complaint also describes several allegedly fraudulent statements made on Dressel's web site, which Plaintiff reasonably expects was published from the United States and transmitted to Indonesia *via* wire-communication technology. The web site was allegedly changed in December 2005 to proclaim Wong's status as a member of Regal Financial Bank's advisory board and as a bank shareholder. (*Id.* 31–34). These communications were allegedly made in order to allay investors' growing concerns about the legitimacy of the Dressel enterprise, which means that the communications represent "a step in the plot [to defraud]." *See Rude*, 88 F.3d at 1544.

Because the complaint alleges facts tending to show that the wire communications had "the same or similar purposes, results, participants, victims, or methods of communication," and were "not isolated events," *see Sedima*, 473 U.S. at 496 n.14, Plaintiff has successfully pled sufficient predicate criminal acts to constitute a "pattern of racketeering activity" under RICO. Because Plaintiff describes the allegedly fraudulent wire communications with such particularity, the complaint pleads sufficient facts to notify Defendants Regal Financial Bank, Jesse Tam, David Thacker and Kelly Thacker of the specific wire communications which Plaintiff alleges to have occurred as a part of Defendants' scheme to defraud. *See Odom*, 486 F.3d at 553 (articulating the pleading requirements for allegations of fraud).

### iii.    Territoriality

Plaintiff alleges that much of the wire fraud and many of the other fraudulent activities occurred from within the United States, which means that the RICO claims are *not* extraterritorial in nature. Plaintiff alleges, for example, that United States wires were used to transfer funds to Defendant Regal Financial Bank. (Complaint 42–46 (Dkt. No. 1)). Plaintiff further alleges facts from which the

ORDER, C09-1786-JCC
Page 17

1   reasonable inference arises that Dressel's web site was published in the United States and transmitted to

2   Indonesia *via* United States wires. (*Id.* 31). Such behavior subjects Defendants to potential liability in

3   the United States, even if the effects of their behavior was felt abroad. As the Supreme Court has stated

4   with respect to the geographic reach of the criminal prohibition at issue: "[T]he offense is complete the

5   moment that [a defendant] execut[s] the scheme inside the United States; the wire-fraud statute punishes

6   the scheme; not its success." *See Pasquatino*, 544 U.S. at 371 (internal markings omitted).

**C.   Conclusion**

8       Because Plaintiff alleges that David Thacker and Kelly Thacker aligned themselves with a

9   racketeering enterprise that wrongfully deprived Indonesian investors of millions of dollars, and because

10  Plaintiff offers specific examples of their wrongful behavior, the RICO claims against both defendants

11  survive the motion to dismiss for failure to state a claim upon which relief can be granted.

12      Plaintiff's RICO claims against Regal Financial Bank and Jesse Tam also survive. Plaintiff's

13  complaint succinctly states the plausible inference about the bank and its chief executive officer and

14  founder which arises from the facts alleged: "[I]n order to obtain deposits for Regal Financial Bank, a

15  start-up bank being formed in 2001, Jesse Tam conspired with Danny Wong and Dressel entities so as to

16  provide Regal Financial Bank with the benefit of the funds raised through the Dressel Ponzi scheme."

17  (*Id.* 62). Such behavior "weakens the stability of the nation's economic system [and] harms innocent

18  investors." *See* Pub. L. 91-452, 84 Stat. 922, 923 (1970). Congress passed the Racketeer Influenced

19  Corrupt Organizations Act in order to provide Plaintiff with the redress it now seeks.

**VI.    OTHER LEGAL CLAIMS**

21       Defendants David Thacker and Kelly Thacker argue that Plaintiff's claims against them

22  sounding in fraud and breach of fiduciary duty should be dismissed for failure to plead the claims with

23  the particularity required by Rule 9 of the Federal Rules of Civil Procedure. (Motion 14–18 (Dkt. No.

24  96)). Because Plaintiff has alleged facts tending to establish that Defendants David Thacker and Kelly

1  Thacker ran the day-to-day affairs of an enterprise engaged in fraud and which breached its fiduciary
2  duties to Indonesian investors, and because Plaintiff alleges specific examples of Defendants' fraudulent
3  misconduct, the motion to dismiss fails.

4      Defendants Jesse Tam and Regal Financial Bank argue that Plaintiff's claims against them for
5  aiding and abetting in the fraud and breach of fiduciary duty should be dismissed because Plaintiff has
6  failed to allege that they actually knew of the fraud and that their actions proximately caused Plaintiff's
7  losses. (Motion 6 (Dkt. No. 98)). Because Plaintiff has pled facts which tend to establish that Defendants
8  maintained a close relationship with Dressel and actually assisted Defendant Danny Wong commit the
9  wrongful acts, these arguments fail.

10      Plaintiffs' claims of conspiracy and unjust enrichment against Defendants Kelly Thacker, David
11  Thacker, Jesse Tam and Regal Financial Bank survive for substantially similar reasons: Plaintiff has
12  alleged facts which tend to show that Defendants acted in concert in order to wrongfully deprive
13  Indonesian investors of their savings and thereby enrich themselves.

14      Finally, Defendants Kevin Hylton and Brian Hill, both of whom are former directors of Regal
15  Financial Bank, argue that Plaintiff's claims against them for aiding and abetting fraud and breach of
16  fiduciary duty should be dismissed. Because Plaintiff has failed to plead any facts tending to show that
17  either Mr. Hylton or Mr. Hill actually knew of any wrongdoing, this argument prevails. Plaintiff's
18  claims against Mr. Hylton and Mr. Hill are therefore dismissed.

19  **A.    Common-Law Fraud & Breach of Fiduciary Duty**

20      To state a claim for common-law fraud in Washington State, a plaintiff must allege "(1)
21  representation of an existing fact; (2) materiality; (3) falsity; (4) the speaker's knowledge of its falsity;
22  (5) intent of the speaker that it should be acted upon by the plaintiff; (6) plaintiff's ignorance of its
23  falsity; (7) plaintiff's reliance on the truth of the representation; (8) plaintiff's right to rely upon it; and
24  (9) damages suffered by the plaintiff." *Adams v. King County*, 192 P.3d 891, 902 (Wash. 2008). In all

25

26  ORDER, C09-1786-JCC
    Page 19

actions pending before this Court, fraud must be pled with sufficient particularity to satisfy the

requirements of Rule 9 of the Federal Rules of Civil Procedure. *Odom*, 486 F.3d at 553.

To state a claim for breach of fiduciary duty in Washington State, a plaintiff must allege "(1) that

a fiduciary relationship existed which gave rise to a duty of care on the part of the defendant to the

plaintiff; (2) that there was an act or omission by the fiduciary in breach of the standard of care; (3) that

the plaintiff suffered damages; and (4) that the damages were proximately caused by the fiduciary's

breach of the standard of care." DAVID DEWOLF, 29 WASHINGTON PRACTICE SERIES § 11.1 (2010).

Under Washington law, "the existence of a fiduciary relationship is not simply a matter of reposing trust

and confidence in the integrity of another." *Moore v. Phipps*, 411 P.2d 157, 160 (Wash. 1966).

Something more is required: "There must be additional circumstances, or a relationship that induces the

trusting party to relax the care and vigilance which he would ordinarily exercise for his own protection."

*Id.* The existence or nonexistence of a fiduciary relationship is a question of law, and "depends in each

case on the particular circumstances." *Id.* at 161.

Washington courts use a test articulated in the *Restatement (Second) of Torts* to determine

whether a plaintiff has stated a claim against a particular defendant for aiding and abetting a second

defendant engage in tortious conduct:

> For harm resulting to a third person from the tortious conduct of another, one is subject to
> liability if he
> (a) does a tortious act in concert with another or pursuant to a common design by him; or
> (b) knows that the other's conduct constitutes a breach of duty and gives substantial
> assistance or encouragement to the other so to conduct himself; or
> (c) gives substantial assistance to the other in accomplishing a tortious result and his own
> conduct, separately considered, constitutes a breach of duty to the third person.

RESTATEMENT (SECOND) OF TORTS § 876 (1979) (cited with approval in *Martin v. Abbott Laboratories*,

689 P.2d 368, 378 (Wash. 1984)).

//

//

ORDER, C09-1786-JCC
Page 20

1          **i.      Discussion Regarding David Thacker & Kelly Thacker**

2          Plaintiff has successfully alleged that Defendants David Thacker and Kelly Thacker fraudulently

3    deprived Indonesian investors of their funds, and that they breached certain fiduciary duties to those

4    investors in the process of having done so. Plaintiff alleges, for example, that Defendants

5    misrepresented their qualifications and the qualifications of other defendants on Dressel's web site, and

6    that investors relied on these misrepresentations to their detriment. (Complaint 32 (Dkt. No. 1)). This

7    alleged behavior, without more, constitutes fraud. Plaintiff alleges more: According to the complaint,

8    David Thacker and Kelly Thacker both attended a meeting in August 2004 where the decision was made

9    to "fine tune" Dressel's profit-and-loss statements in order to conceal what Kelly Thacker herself

10   described as "some kind of scam." (*Id.* 39). Plaintiff alleges that certain Indonesian investors were

11   induced to invest in Dressel by these misrepresentations contained in Dressel financial statements.

12   Plaintiff has therefore stated a claim for fraud against David Thacker and Kelly Thacker.

13         Plaintiff's allegations also constitute a successful claim for breach of fiduciary duty. According

14   to Plaintiff, David Thacker and Kelly Thacker ran the day-to-day operations of an organization that

15   described itself as a legitimate investment trust. According to Dressel brochures, the company offered

16   "ethical and unbiased decision-making, aimed at client portfolio long-term enrichment." (*Id.* 30). The

17   same brochure stated that Dressel investors could "be assured that only outstanding stocks, projects and

18   investments will be recommended for the investment committee's consideration." (*Id.* 31). Because

19   Dressel allegedly made these representations, and because Dressel principals allegedly represented to

20   potential investors that they were investment professionals, the reasonable Indonesian investor was

21   justified in "reposing his confidence in the trust and confidence of [Dressel]," and thereby "relax[ing]

22   the care and vigilance which he would ordinarily exercise for his own protection." *See Moore*, 411 P.2d

23   at 160. Plaintiff has therefore successfully alleged the existence of a fiduciary relationship. Defendants'

24   allegedly fraudulent behavior represents a breach of the duties that attach to such a relationship. Because

25

26   ORDER, C09-1786-JCC
     Page 21

1  Plaintiff also alleges that investors were harmed by such a breach, the claim against David Thacker and

2  Kelly Thacker survive the motion to dismiss.

3      Plaintiff states the claims with the required particularity by identifying the web site on which the

4  misrepresentations about individuals' qualifications were made and the approximate date on which they

5  appeared. Plaintiff also identifies the city in which the August 2004 meeting occurred, and the general

6  content of the discussions. Plaintiff has therefore offered the allegations with sufficient particularity

7  "that Defendants can prepare an adequate answer from the allegations." *Walling*, 476 F.2d at 397.

8      ii.      **Discussion Regarding Jesse Tam & Regal Financial Bank**

9      Plaintiff has also successfully alleged that Defendants Jesse Tam and Regal Financial Bank

10  aided and abetted Danny Wong and other defendants to defraud the Indonesian investors, and to breach

11  the fiduciary duties which they owed to those investors. Wong's allegedly fraudulent behavior and

12  breach of fiduciary duty are self-evident: Wong allegedly gave a series of presentations to Indonesian

13  investors at which he induced them to invest in Dressel by making material misrepresentations of fact,

14  including misrepresentations about the nature of the investment portfolio which Dressel maintained and

15  about the qualifications of Dressel principals. (Complaint 28 (Dkt. No. 1)). Plaintiff successfully alleges

16  that Tam aided and abetted in the underlying fraud by alleging that Tam traveled to Indonesia with

17  Wong in May 2006, helping Wong to convince investors to maintain their funds in an enterprise that

18  was doomed to fail. (*Id.* 60). If true, such behavior potentially constitutes "a tortious act in concert with

19  another or pursuant to a common design[.]" *See* RESTATEMENT (SECOND) OF TORTS § 876. Tam also

20  allegedly provided Wong with a letter of recommendation which Wong presented to investors in order

21  to bolster his own credibility. (*Id.* 58–59). If true, such behavior subjects Tam to liability for knowingly

22  "giv[ing] substantial assistance or encouragement to the other [in a breach of duty]." *See* RESTATEMENT

23  (SECOND) OF TORTS § 876. Plaintiff has therefore stated a claim against Jesse Tam for aiding and

24  abetting fraud and breach of fiduciary duty.

25

26

1    In large part because Jesse Tam was Regal Financial Bank's chief executive officer when he

2    allegedly committed all of the above acts, Plaintiff's claims of aiding and abetting fraud and breach of

3    fiduciary duty also survive against Regal Financial Bank. Plaintiff has also alleged facts other than those

4    that rely on Tam's status which tend to establish the bank's wrongful behavior, however. For example,

5    Plaintiff alleges that Dressel opened substantial accounts with Regal Financial Bank the very year that

6    the institution opened, and that Dressel accounts comprised approximately ten percent of the bank's

7    deposits only two years later. (Complaint 57, 60 (Dkt. No. 1)). Moreover, Regal Financial Bank was

8    mentioned prominently in Tam's letter of recommendation for Wong, and Wong was made a member of

9    the bank's advisory board, a fact which was allegedly prominently displayed on Dressel's web site. (*Id.*

10   32). If true, such behavior by a banking corporation subjects it to liability for knowingly "giv[ing]

11   substantial assistance or encouragement to the other [in a breach of duty]." *See* RESTATEMENT (SECOND)

12   OF TORTS § 876.

13   Finally, Plaintiff's allegations against both Tam and Regal Financial Bank are made with the

14   required particularity. Plaintiff quotes extensively from the letter of recommendation, thereby describing

15   it in great detail. (Complaint 58 (Dkt. No. 1)). Plaintiff describes the time and location of the meeting

16   which Tam attended with Wong. (*Id.* 60). Plaintiff alleges an entire series of wire transfers made from

17   Indonesia to bank accounts at Regal Financial Bank which would constitute an important part of the

18   underlying scheme to defraud. (*Id.* 42–46). Plaintiff has therefore successfully identified "the

19   circumstances constituting the alleged fraud . . . with sufficient definiteness to advise [Defendants] of

20   the claim which they must meet." *Walling*, 476 F.2d at 397.

21   **B.    Common-Law Conspiracy & Unjust Enrichment**

22   To state a claim for conspiracy, a plaintiff must plead (1) that two or more people combined to

23   accomplish an unlawful purpose, or that they combined to accomplish a lawful purpose by unlawful

24   means; and (2) that they entered into an agreement to accomplish the conspiracy." *Bonneville v. Pierce*

25

26   ORDER, C09-1786-JCC
     Page 23

1    *County*, 202 P.3d 309, 318 (Wash. Ct. App. 2008). To state a claim for unjust enrichment, a plaintiff

2    must plead that (1) he conferred a benefit upon the defendant; (2) the defendant knew that it had

3    received such a benefit; and (3) the defendant has accepted or retained the benefit under circumstances

4    that would make it inequitable or unjust for the defendant to do so. *Cox v. O'Brien*, 206 P.3d 682, 688

5    (Wash. Ct. App. 2009).

6         Plaintiff's claims of conspiracy and unjust enrichment survive for the same reasons that its

7    claims sounding in RICO and the common law survive: Plaintiff has successfully alleged that

8    Defendants enriched themselves by embarking upon a comprehensive scheme to defraud Indonesian

9    investors of more than one-hundred million dollars.

10   **C.    Liability of Bank Directors**

11        In Washington State, the director of a corporation is *not* personally liable for the tortious acts of

12   the corporation's officers and employees. *Messenger v. Frye*, 28 P.2d 1023, 1025 (Wash. 1934); *see also*

13   *Northern Codfish Co. v. Stiberg*, 164 P. 750, 752 (Wash. 1917) ("A general allegation of [negligence] is

14   not sufficient to hold [corporate] trustees individually responsible, where they did not participate in, and

15   had no knowledge of, the transaction."). A director is, however, personally liable for the torts that he or

16   she commits while serving in the capacity of corporate director: "[I]mmunity vanishes if such corporate

17   officer knowingly participated in, cooperated in the doing of, or directed that the [tortious] acts be

18   done." *Johnson v. Harrigan-Peach Land Development Co.*, 489 P.2d 923, 928 (Wash. 1971).

19        Because Plaintiff has failed to allege any facts which tend to indicate that Defendants Brian Hill

20   and Kevin Hylton personally defrauded the Indonesian investors or otherwise participated in the

21   conspiracy, the claims against these defendants must fail. Plaintiff's failure to plead the required facts is

22   evident: *The complaint nowhere even mentions either defendant's name*. It instead attempts to attach

23   liability to the directors for the behavior of Jesse Tam, the bank's chief executive officer. For example,

24   the complaint states that "the Regal Financial Bank Defendants had actual knowledge that the Ponzi

25

26   ORDER, C09-1786-JCC
     Page 24

1   Scheme Defendants, and in particular Danny Wong, were stealing the funds of members of Plaintiff held

2   at Regal Financial Bank." (Complaint 82 (Dkt. No. 1)). With respect to Jesse Tam, Plaintiff recounts

3   specific facts to support this conclusion, thereby pleading "sufficient factual matter, accepted as true, to

4   state a claim to relief that is plausible on its face." *See Iqbal*, 129 S.Ct. at 1949. With respect to the bank

5   directors, however, Plaintiff offers only the bare conclusion that the directors knew of the other

6   defendants' wrongful behavior. This is inadequate: "[T]he complaint pleads facts that are merely

7   consistent with [the] defendants' liability," which means that "it stops short of the line between

8   possibility and plausibility of entitlement to relief." *Id.* (internal markings omitted). Plaintiff's claims

9   against Defendants Brian Hill and Kevin Hylton are therefore dismissed.

10  **VII.    PERSONAL JURISDICTION**

11      Defendants Donald Sherer and Michele Sherer move to dismiss Plaintiff's claims against them

12  based on lack of *in personam* jurisdiction. (Motion (Dkt. No. 110). For the reasons explained below, this

13  Court has jurisdiction over both defendants. Plaintiff's claims against Donald Sherer and Michele Sherer

14  therefore survive.

15  **A.    Minimum Contacts**

16      This Court applies Washington State's jurisdictional statute to determine whether an exercise of

17  *in personam* jurisdiction over a defendant is proper. *Core-Vent Corp. v. Nobel Industries AB*, 11 F.3d

18  1482, 1484 (9th Cir. 1993). Washington State's jurisdictional statute "permits the exercise of

19  jurisdiction to the full extent of the Due Process Clause of the United States Constitution." *Easter v.*

20  *American West Financial*, 381 F.3d 948, 960 (9th Cir. 2004) (discussing WASH. REV. CODE § 4.28.185).

21      Under the Due Process Clause, this Court may exercise jurisdiction over a defendant only if he

22  or she had such "minimum contacts" with Washington State such that the maintenance of the underlying

23  suit "does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v.*

24  *State of Washington*, 326 U.S. 310, 316 (1945); *see also World-Wide Volkswagen Corp. v. Woodson*,

25

26  ORDER, C09-1786-JCC
    Page 25

444 U.S. 286, 291–92 (1980) (describing the "concept of minimum contacts" as, *inter alia*, "protecting the defendant against the burdens of litigating in a distant or inconvenient forum"). Courts in the Ninth Circuit apply a three-prong test to determine whether a particular exercise of *in personam* jurisdiction is permissible:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, *i.e.*, it must be reasonable.

*Schwarzenegger v. Fred Martin*, 374 F.3d 797, 802 (9th Cir. 2004). The party invoking this Court's jurisdiction bears the burden of establishing the first two prongs of the test. If the party succeeds in doing so, the opposing party may still avoid an exercise of jurisdiction over his person by "present[ing] a compelling case" that such an exercise of jurisdiction would be unreasonable. *Id.*

**i.    Discussion**

This Court has *in personam* jurisdiction over both Donald Sherer and Michele Sherer. At an investor presentation in July 2004, Donald Sherer allegedly told Indonesian investors that Dressel maintained an office in Seattle because of a desire to share office space with Regal Financial Bank. (Complaint 28 (dkt. No. 1)). At the same meeting, Mr. Sherer allegedly told investors that they should wire their funds directly to Regal Financial Bank, which is in Washington State. Both Donald Sherer and Michele Sherer then allegedly used the investors' money to fund their own companies and purchase expensive consumer goods for themselves. Such activity constitutes the "purposeful availment" of the privilege of doing business in Washington State. *See Schwarzenegger*, 374F.3d at 802. Because Plaintiff's claim arises out of Defendants' activities which are related to the forum of Washington State, *see id.*, Plaintiff has successfully established the first two prongs of the test which Ninth Circuit courts

ORDER, C09-1786-JCC
Page 26

1    employ to determine whether an exercise of *in personam* jurisdiction is proper.

2        Defendants cannot offer a "compelling case" that this Court's exercise of jurisdiction over their

3    persons would be unreasonable. Defendants' arguments fail to address the jurisdictional issue which

4    now confronts the Court: For example, Defendants argue that Plaintiff's entire theory of the case is

5    "absurd and slanderous." (Motion 8 (Dkt. No. 110)). Such an argument goes to the merits of the case,

6    not to the jurisdictional issue. Defendants' confusion persists throughout their briefing: They argue in

7    part that "Plaintiff is not an assignee of Dressel investors for value, and fails to meet federal standards to

8    qualify as a plaintiff in United States federal courts." (*Id.* 4). This Court has already decided that

9    Plaintiff enjoys constitutional standing, and will not address the issue again. (*See* Order (Dkt. No. 84)).

10       Because Defendants Donald Sherer and Michele Sherer purposefully availed themselves of the

11   privilege of doing business in Washington State, and because investors were allegedly harmed by

12   actions they took which were related to Washington State, this Court has jurisdiction over them both.

13   **VIII.   CONCLUSION**

14       For the foregoing reasons, the Court hereby GRANTS the motion to dismiss of Defendants Brian

15   Hill and Kevin Hylton. (Dkt. No. 85). The Court DENIES all other pending motions to dismiss. (Dkt.

16   Nos. 96, 98, 99 & 110).

17       The Court also DENIES the pending motion to stay discovery (Dkt. No. 100). Discovery shall

18   proceed forthwith. Finally, the Court STRIKES Plaintiff's motion to add supplemental authority as

19   moot. (Dkt. No. 160).

21       SO ORDERED this 17th day of February, 2011.

23   _____

24   JOHN C. COUGHENOUR
     United States District Judge

26   ORDER, C09-1786-JCC
     Page 27