THE HONORABLE JOHN C. COUGHENOUR

1

2

3

4

5

6

7                          UNITED STATES DISTRICT COURT
                          WESTERN DISTRICT OF WASHINGTON
8                                    AT SEATTLE

9   PERKUMPULAN INVESTOR CRISIS              CASE NO. C09-1786-JCC
    CENTER DRESSEL - WBG,
10                                           ORDER

11                   Plaintiff,

12          v.

13  DANNY MK WONG, *et al.*,

14                   Defendants.

15

16          This matter comes before the Court on the motion to dismiss filed by Defendant Jared

17  Sherer and joined by Defendants Donald and Michelle Sherer[1] (Dkt. Nos. 388) and Plaintiff's

18  opposition thereto (Dkt. Nos. 412). Upon review, the Court concludes that Plaintiff's RICO

19  claim is barred under section 107 of the Private Securities Litigation Reform Act and

20  DISMISSES that claim with prejudice.[2] In light of the dismissal of Plaintiff's sole federal claim,

21  _____

22      [1] Defendant Michelle Sherer withdrew her own initial motion to dismiss and requested permission to file a
    renewed motion. The Court grants the motion to withdraw (Dkt. No. 440) and STRIKES the initial motion from the
23  docket. (Dkt. No. 430.) Lastly, the Court GRANTS the Sherer Defendants' requests to file overlength briefs. (Dkt.
    No. 429, 431.)
24
        [2] While Michelle and Donald Sherer, two of the "RICO Defendants," joined Jared Sherer's motion, the
25  remaining RICO Defendants did not move for dismissal on PSLRA grounds. Nonetheless, because the same analysis
    applies to the RICO conduct of every RICO Defendant, the Court dismisses that claim as to the non-moving
26  defendants as well. *See Abagninin v. AMVAC Chem. Corp.*, 545 F.3d 733, 743 (9th Cir. 2008) (quoting *Silverton v.
    Dep't of Treasury*, 644 F.2d 1341, 1345 (9th Cir.1981) *cert. denied*, 454 U.S. 895 (1981) (holding that where court

1   the Court declines to exercise its supplemental jurisdiction over this matter and dismisses the

2   remaining claims without prejudice. The Court also rules on the parties' sanctions motions (Dkt.

3   No. 485, 487, 499) and motion to seal (Dkt. No. 526) as explained herein.

4   **I.    BACKGROUND**

5       **A.    The Dressel Ponzi Scheme**

6           The instant matter "sounds in allegations of international financial fraud." (Dkt. No. 169

7   at 2.) Plaintiff Perkumpulan Investor Crisis Center Dressel – WBG ("Perkumpulan") represents

8   Indonesian investors whom Defendants allegedly defrauded of hundreds of millions of dollars.

9   Defendants were the operators of Dressel Investment Limited, which Plaintiff describes as a

10  "classic Ponzi scheme" that began its fraudulent efforts in 2001 and ultimately collapsed in 2007.

11  According to Plaintiff's complaint, Defendants represented to thousands of Indonesian

12  individuals that the Dressel principals were qualified investment professionals capable of

13  delivering annual returns between twenty-four and twenty-eight percent. In reliance upon these

14  representations, Plaintiff alleges, Indonesian individuals invested tens of thousands of dollars

15  each in Dressel's fraudulent scheme. Rather than investing the money as promised, Defendants

16  allegedly operated a Ponzi scheme on the basis of "lies and deception," whereby they used newer

17  investors' funds to repay earlier investors and stole large amounts of the money for personal use.

18  (Dkt. No. 381 at ¶¶ 4.7–4.8.)

19          Plaintiff includes as "RICO" or "Ponzi Scheme" defendants Donald and Michelle Sherer,

20  Kenneth McCabe, Danny Wong, Joseph Yau, Dwight Williams, Luis Garza, Kelly and David

21  Thacker, and former-defendant Frank Ho. (*Id.* at ¶ 4.2.) These individuals together operated the

22  investment scheme through Dressel BVI and an Indonesian corporation, PT Wahana Bersama

23  Globalindo ("WBG"), which served as "the marketing agent and principal representative of

24  _____

25  grants motion to dismiss as to one defendant, court may dismiss claims against non-moving  or non-appearing
    defendants who are "in a position similar to that of moving defendants")); *Columbia Steel Fabricators, Inc. v.*
26  *Ahlstrom Rec*, 44 F.3d 800, 802 (9th Cir. 1995) ("We have upheld dismissal with prejudice in favor of a party which
    had not yet appeared, on the basis of facts presented by other defendants which had appeared.")).

Dressel BVI." (*Id.* at ¶ 4.3.) Dressel, with WBG as its sales agent, allegedly solicited Indonesian

individuals to invest in two separate funds: (1) the Strategic Portfolio Management Scheme Fund

("SPORTSMANS Fund"), which promised a dividend yield of twenty-four percent per annum

for a minimum investment of $5,000; and (2) the Global Markets Portfolio Fund ("GMP Fund"),

which promised a divided yield of twenty-eight percent per annum for a minimum investment of

$10,000. (*Id.* at ¶ 4.4.) Defendants solicited Indonesian investors at presentations given by the

Ponzi Scheme Defendants in Indonesia; through brochures distributed to potential investors;

through the Dressel website; and through WBG marketing personnel, who allegedly worked at

the Ponzi Scheme Defendants' direction. (*Id.* at ¶¶ 4.5, 4.12–4.31; *see* Dkt. No. 169 at 3–6.)

Perkumpulan's complaint alleges in detail the role of each Ponzi Scheme Defendant.

Donald and Michelle Sherer allegedly served as the "Director in Charge" and "Office Manager"

of Dressel from 2001 to 2005, respectively. Plaintiff alleges that the Sherers played a crucial role

in operating the Dressel Ponzi Scheme. Both individuals traveled to Indonesia to solicit

Indonesian investors in person and signed investment certificates after receiving investors' funds.

In 2005, the Sherers purported to resign from Dressel, but Plaintiff alleges that they continued to

spend investors' stolen funds and even demanded "hush" payments from other members of the

scheme. (*See id.* at ¶¶ 3.11–3.12.) Additionally, the Sherers allegedly engaged in sham litigation

intended to conceal their role in the scheme. (*Id.*)

Defendants Danny Wong, Joseph Yau, Luis Garza, and former-defendant Frank Ho, are

individuals who allegedly played major roles in the Dressel scheme.[3] Perkumpulan alleges that

Danny Wong became a Director of Dressel in 2001 and largely masterminded the Ponzi Scheme

while living in Asia. Joseph Yau and Frank Ho allegedly worked as associates of Mr. Wong in

carrying out Dressel's activities in Asia. According to Perkumpulan, both Danny Wong and

---

[3] Mr. Garza only appeared in this lawsuit in March 2014, approximately four years after Plaintiff filed its first complaint and after the Court found him to be in default. He now asks the Court to set aside the entry of default and to dismiss the RICO claims against him. (Dkt. Nos. 544, 546.) Because the analysis herein applies to Mr. Garza as a RICO defendant, the Court denies his pending motions as moot and dismisses the claims against him.

1   Joseph Yau traveled to Indonesia to solicit investors in person and had repeated communications

2   with investors to assuage their concerns about the fraudulent investments. (*Id.* at ¶¶ 3.5–3.7.) Mr.

3   Garza allegedly worked as WBG's Surabaya branch manager and, at the direction of Danny

4   Wong, Joseph Yau, and other Ponzi Scheme Defendants, directed and/or sent wire transfers of

5   stolen funds so as to enrich himself and others. (*Id.* at ¶¶ 3.28, 4.2, 4.12, 4.44–4.47.) Mr. Garza

6   also oversaw the Mexican operations of the Dressel Scheme and allegedly engaged in sham

7   litigation intended to keep the fraud from being disclosed after the fact. (*Id.*) Additionally,

8   Defendant Dwight Williams is a Utah lawyer who allegedly served as legal counsel to Danny

9   Wong and Dressel BVI, and represented himself to others as Dressel's General Counsel. Mr.

10   Williams, like other Ponzi Scheme Defendants, traveled to Indonesia to solicit investors for the

11   Dressel scheme. Perkumpulan further alleges that Mr. Williams drafted correspondence to

12   potential investors commending Danny Wong's "business character" so as to lend legitimacy to

13   the Dressel Ponzi Scheme and its directors. (*Id.* at ¶ 3.8.)

14        Finally, Plaintiff names as RICO Defendants Kelly and David Thacker, and Kenneth

15   McCabe. The Thackers were "owners and directors" of Dressel who misrepresented themselves

16   as experts to Indonesian investors, when in reality they were unqualified and planned to steal

17   investors' funds. Perkumpulan alleges that the Thackers met with Indonesian investors in person,

18   met with Dressel's marketing agents in Seattle, and met with WBG representatives in Indonesia

19   in "an ongoing effort to solicit investors in the Dressel Ponzi Scheme and to fleece Indonesian

20   investors." (*Id.* at ¶¶ 3.9–3.10.) Defendant Kenneth McCabe was also a director of Dressel and

21   "later became a 50% shareholder." As explained in more detail below, Mr. McCabe held himself

22   out to prospective investors as "an international expert on finance and economics" at numerous

23   in-person presentations and signed investor certificates for Dressel BVI. (*Id.* at ¶ 3.13.) Together,

24   these defendants operated the Dressel Ponzi Scheme, allegedly defrauding Indonesian investors

25   of hundreds of millions of dollars.

26   //

ORDER
PAGE - 4

Plaintiff's complaint lists in detail the alleged misrepresentations made to investors. In May 2001 at a presentation in Jakarta, Indonesia, for example, Defendants Donald Sherer and Joseph Yau misrepresented their qualifications to prospective investors. Mr. Sherer allegedly told potential investors that he was an investment professional when he was in fact a disbarred attorney who worked as a bus driver. Mr. Yau similarly portrayed himself as a former investment banker who joined Dressel because "he wanted to do something on his own," when in reality he had been censured by Hong Kong financial authorities. Neither Sherer nor Yau mentioned this public censure. (*Id.* at ¶ 4.13.) Later in 2001, Donald Sherer represented to prospective investors that Dressel had a "fiduciary and moral obligation to be as safe as we can" in investing funds entrusted with Dressel's operators; that he had years of experience in the foreign exchange industry; and that he had taught financial management for years. (*Id.* at ¶ 4.14.) Plaintiff alleges that these statements, too, were false. (*Id.*)

And so the alleged misrepresentations continued. In 2004, Donald and Michelle Sherer, along with Danny Wong and Dwight Williams, solicited new Indonesian investors at another presentation. There, they represented that "the Indonesian investors would be the 'partners' of Dressel BVI; that the investment performance of Dressel BVI was better than Merrill Lynch; and that Dressel had profits averaging 40 percent per annum," which enabled Dressel to pay investors twenty-four to twenty-eight percent returns. (*Id.* at ¶¶ 4.14–4.21.) Beyond the in-person presentations and WBG marketing efforts, Plaintiff alleges, Defendants espoused many of the same misrepresentations in brochures provided to investors and on its website, which was hosted from the United States. (*See id.* at ¶¶ 4.22–4.31.) For example, Dressel's website described Dressel as a legitimate investment opportunity and misrepresented the qualifications of Donald and Michelle Sherer, Kenneth McCabe, and David Thacker. (*Id.* at ¶¶ 4.26–4.31; *see also id.* at ¶¶ 4.22–4.25 (detailing misrepresentations in brochures.)) Plaintiffs allege that such representations were intended to deceive the Indonesian investors and conceal the fact that the defendants were in reality operating a Ponzi Scheme to steal investors' money. (*Id.* at ¶ 4.21.)

When investors relied on Defendants' misrepresentations and invested in Dressel's funds, the investor signed a "Portfolio Management Agreement" that named Dressel as Portfolio Manager. (*Id.* at ¶ 4.6.) For some time, investors received the promised returns. But by September 2006, Dressel stopped making payments to investors and the alleged Ponzi scheme began to unravel. Danny Wong attempted to assuage investors' concerns, writing letters and assuring investors in person that Dressel was fully functioning and intended to honor its contractual obligations. But the assurances rang hollow. Plaintiff alleges that ultimately, Dressel proved unable to meet its commitments and that Indonesian investors lost the funds they had contributed to Dressel. (*Id.* at ¶¶ 4.51–4.58.)

As early as 2005, and more prominently in the wake of Dressel's collapse, Defendants allegedly sought to conceal their wrongdoing and protect themselves from legal liability. Among other things, Plaintiff alleges that the defendants engaged in extensive money laundering throughout the course of the scheme to conceal the stolen nature of the funds. (*Id.* at ¶¶ 4.8, 4.24, 4.49, 4.54.) Additionally, the Sherer Defendants left Dressel in 2005, leaving it in the hands of Defendants David and Kelly Thacker. Thereafter, the Thackers, Danny Wong, and Dwight Williams formed the Asset Recovery Trust with the purported goal of recovering Dressel assets from the Sherer Defendants. Since its formulation, the Trust has been engaged in extensive litigation, filing a lawsuit against the Sherers in Utah in 2005, and having been named as defendants in at least three lawsuits by Donald and Michelle Sherer. Purportedly, each of the lawsuits have been filed to protect the investors' interests. Plaintiff believes otherwise. Its complaint alleges that "[a]ll of these pre-existing lawsuits are tainted by the pre-existing associations of those involved[,]" and concludes that "[t]here has been an ongoing effort to deceive the Dressel investors into believing that their rights were being legitimately advocated in the United States. None of these existing suits represents a good-faith effort to recover the stolen assets." (*Id.* at 4.70.)

//

**B.      The Instant Lawsuit**

Plaintiff filed the above-captioned lawsuit in 2009. Its complaint initially raised the following claims: (1) a Racketeer Influenced and Corrupt Organizations Act ("RICO") claim, *see* 18 U.S.C. § 1964(c), against the "Ponzi Scheme Defendants"; (2) a RICO claim against the "Regal Financial Bank Defendants"[4]; (3–4) state-law fraud claims against the Ponzi Scheme and Regal Financial Bank Defendants; (5–6) state-law breach of fiduciary duty claims against the Ponzi Scheme and Regal Financial Bank Defendants; (7) a common law conspiracy claim against all Defendants; (8–9) negligence claims against the Regal Financial Bank Defendants; (10) an unjust enrichment claim against the Ponzi Scheme Defendants; and (11–12)  negligence and negligent misrepresentations claims against Tanner LC. (Dkt. No. 1 at ¶¶ 6.1–17.8.)

In 2013, the Court granted Plaintiff leave to file an amended complaint. In that pleading, most of Plaintiff's allegations and claims remained the same—it merely added defendants and claims it believed necessary as a result of discovery obtained during the pendency of this lawsuit. Specifically, Plaintiff supplemented its allegations regarding the scheme's use of Tanner LC's accounting services and added Randy Sellars—a Tanner LC accountant who worked on the Dressel account—and Professional Business Advisors, LLC, as defendants to this matter. (Dkt. No. 350 at 2–3.) Plaintiff also named as additional defendants individuals who hold title to certain assets in Alaska, which according to Plaintiff, constitute assets obtained with proceeds of the fraudulent scheme. (*Id.* at 3.) Those individuals include Jared Sherer, Robert Jinks, the Asset Recovery Trust, Zarahemla Trusts One and Two, Intrepid Trust, Elite Portfolio, LLC, PADRM Gold Mine LLC, Rafael Benita Garza, and Global Consulting Services A.S. de C.V. (Dkt. No. 375 at 3.) As explained by Plaintiff, "the purpose of [the] amendment is for the defrauded investors to be able to seize whatever remains of their funds invested in Dressel" if they succeed on their other claims. (Dkt. No. 350-2 at 106.)

---

[4] As discussed below, the "Regal Financial Bank" Defendants have already been dismissed from this matter. Accordingly, the Court declines to recount their alleged involvement in detail.

1    In the course of the lawsuit, the Court dismissed Plaintiff's claims against Ponzi Scheme

2  Defendant Frank Ho. The Ninth Circuit affirmed that dismissal in late 2013. (Dkt. No. 534.)

3  Additionally, the parties have resolved by private settlement Plaintiff's claims against the "Regal

4  Financial Bank Defendants" and Defendants Tanner LC, Randy Sellers, and Professional

5  Business Advisors. (Dkt. No. 214, 540.) Finally, Ponzi Scheme Defendants Danny Wong and

6  Joseph Yau have failed to appear or otherwise defend against this lawsuit. The other Ponzi

7  Scheme Defendants have proceeded both with and without representation.

8    In an already long-running dispute, the filing of Plaintiff's amended complaint brought

9  forth a barrage of motions by all parties in a manner that the undersigned has not witnessed in

10  more than thirty-two years on the bench. Now pending before this Court are multiple motions to

11  dismiss (Dkt. Nos. 377, 388, 404, 430, 432, 441, 546), as well as summary judgment motions

12  (Dkt. Nos. 509, 516), discovery and other ancillary motions (Dkt. Nos.  426, 427, 440, 457, 477,

13  485, 506, 526, 538, 544), and motions for sanctions filed by multiple parties (Dkt. Nos. 426, 487,

14  499). The Court has reviewed every pending motion, but upon due consideration and after

15  undertaking its own research, concludes that Plaintiff's RICO claim is barred under section 107

16  of the Private Securities Litigation Reform Act. Because Plaintiff's sole federal claim is

17  insufficient as a matter of law, the Court declines to rule on the remainder of the parties'

18  dispositive and discovery motions, dismisses Plaintiff's RICO claim with prejudice, and declines

19  to exercise its supplemental jurisdiction over the remaining state law claims. The Court addresses

20  the parties' motions for sanctions below.

21  **II.    <u>DISCUSSION</u>**

22    **A.    Legal Standard**

23    A party may move to dismiss a complaint that fails to state a claim upon which relief can

24  be granted. FED. R. CIV. P. 12(b)(6). To survive a motion to dismiss, a complaint must contain

25  sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face.

26  *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009). A claim has facial plausibility when the plaintiff

1   pleads factual content that allows the court to draw the reasonable inference that the defendant is

2   liable for the misconduct alleged. *Id.* at 678. A claim that fails to present a "cognizable legal

3   theory" or sufficient facts to support a cognizable claim will be dismissed under Rule 12(b)(6).

4   *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121 (9th Cir. 2008). Finally, the

5   Court dismisses a claim with prejudice only where "the pleading could not possibly be cured by

6   the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000).

7          **B.      The Defendants' Motions to Dismiss**

8          Before turning to the Private Securities Litigation Reform Act analysis, the Court

9   addresses Plaintiff's threshold argument that the joinder of Michelle and Donald Sherer to Jared

10  Sherer's motion to dismiss is improper. Plaintiff asserts that Mr. and Mrs. Sherer waived the

11  RICO/PSLRA defense by not raising it in their motion to dismiss Plaintiff's original complaint

12  and that their joinder is inappropriate because Jared Sherer has no standing to challenge the

13  Plaintiff's RICO claims. (Dkt. No. 412 at 10–12.) As to the latter argument, the Court agrees that

14  Jared Sherer is not a RICO defendant and accordingly could not successfully challenge the RICO

15  claim. However, such a conclusion does not preclude the Court from considering the motion's

16  RICO arguments as to Michelle and Donald Sherer, since those individuals jointly filed the

17  motion to dismiss and undisputedly have standing to raise such challenges.

18         As to the former argument, the Court again agrees that *pro se* defendants Michelle and

19  Donald Sherer could have done a better job in their defense of this case by raising the PSLRA

20  failure to state a claim argument in their motion to dismiss Plaintiff's initial complaint. However,

21  the Court does not find raising it in response to Plaintiff's amended complaint to be problematic.

22  Federal Rule of Civil Procedure 12(h)(2) expressly provides that a "[f]ailure to state a claim"

23  defense "may be raised" in any initial pleading, by a motion under Rule 12(c) (motion for

24  judgment on the pleadings), or at trial." FED. R. CIV. P. 12(h)(2); *see also* FED. R. CIV. P.

25  12(g)(2) (limitation on successive 12(b) motions does not apply to failure to state a claim

26  defenses raised in accordance with Rule 12(h)(2) or (3)). Even if the Court agreed that the instant

motion was a "procedurally defective" motion to dismiss—which it does not, since the motion was not preceded by an answer to the amended complaint—Michelle and Donald Sherer could simply file a motion for judgment on the pleadings on the same ground, which would require the same analysis under the same standard of review. *See MacDonald v. Grace Church Seattle*, 457 F.3d 1079, 1081 (9th Cir. 2006) (treating procedurally defective motion to dismiss as motion for judgment under the pleadings); *Dworkin v. Hustler Magazine, Inc.,* 867 F.2d 1188, 1192 (9th Cir. 1989) (Rule 12(b)(6) motion to dismiss and Rule 12(c) motion for judgment on the pleadings are "functionally identical" and require the same standard of review).

The Court sees no reason to prolong this long-running dispute on such technical grounds, since the instant motions resulted in neither prejudice nor surprise, Plaintiff chose to brief the substantive issues for the Court's consideration, and the same standard of review applies whether construed as a motion to dismiss or motion for judgment on the pleadings. *Cf. National City Bank, N.A. v. Prime Lending, Inc.*, No. C10-0034, 2010 WL 2854247, at *2 (E.D. Wash. July 19, 2010) (explaining that "judicial economy favors ignoring the motions' technical difficulties"— that it was a successive 12(b) motion—where plaintiffs did not dispute that "Defendants would simply be able to renew their motion as a Rule 12(c) motion for judgment on the pleadings after filing an answer"). The Court also provides defendants some leeway in their approach to this case given their *pro se* status. Accordingly, the Court proceeds to analyze the Sherers' PSLRA argument.

**C.      RICO and the Private Securities Litigation Reform Act**

Congress enacted the Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO") to "seek the eradication of organized crime in the United States[.]" *Organized Crime Control Act of 1970, Statement of Findings and Purpose,* Pub.L. No. 91–452, 84 Stat. 922 (1970). The most oft-used provision, which Plaintiff relies upon here, prohibits "person[s] employed by or associated with" an enterprise engaged in or affecting interstate commerce from conducting the enterprise's affairs through a "pattern of racketeering activity." 18 U.S.C. §

1964(c). "Racketeering activity" includes a long list of statutorily defined predicate acts such as mail and wire fraud, bank fraud, money laundering, and transacting in stolen property. *See* 18 U.S.C. § 1961(1)(B). In addition to its criminal prohibitions, RICO provides a private cause of action that entitles a successful private plaintiff to treble damages and reasonable attorney's fees. To establish the basic elements of a civil RICO claim, a private plaintiff must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Sedima S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985). The plaintiff must also allege that he was injured in his business or property "by reason of" the RICO violation. 18 U.S.C. § 1964(c).

Section 107 of the Private Securities Litigation Reform Act of 1995 ("PSLRA") sought to curtail abusive litigation by eliminating securities fraud as a predicate act in civil RICO claims.[5] Section 1964(c), which establishes RICO's civil cause of action, now provides in relevant part:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, *except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962*.

18 U.S.C. § 1964(c) (emphasis added). In amending this provision, "Congress reasoned [that] securities laws generally provide an adequate remedy for securities fraud and that imposition of the treble damages provided by RICO was unfair in those cases." *MJK Partners, LLC v. Husman*, 877 F. Supp. 2d 596, 603 (N.D. Ill. 2012); *see Bald Eagle Area School District v. Keystone Financial Inc.*, 189 F.3d 321, 327 (3d Cir. 1999) (explaining that the focus of the RICO amendment was on "completely eliminating the so-called 'treble damage blunderbuss of RICO' in securities fraud cases") (quotation omitted)).

*//*

---

[5] The so-called "RICO Amendment" contains one limited exception. A private plaintiff may rely on securities-fraud conduct in a civil suit if the defendant was criminally convicted of the securities fraud. *See* 18 U.S.C. § 1964(c). This exception is not relevant to the instant case.

In practice, "Congress intended not only to eliminate securities fraud as a predicate offense in a civil RICO action, but also to prevent plaintiffs from attempting to plead other specified offenses, such as mail or wire fraud, as predicate acts under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud." *Id.*; *Howard v. America Online Inc.*, 208 F.3d 741, 749–50 (9th Cir.), *cert. denied*, 531 U.S. 828 (2000) (plaintiff cannot assert RICO claim based on predicate acts that sound in securities fraud even if the claim is pleaded as a matter of mail or wire fraud). The PSLRA exclusion similarly applies even if the RICO plaintiff could not actually assert a securities fraud claim. *Howard*, 208 F.3d at 749–50; *Swartz v. KPMG LLP*, 401 F. Supp. 2d 1146, 1151 (W.D. Wash. 2004) *aff'd*, 476 F.3d 756, 761 (9th Cir. 2007). And finally, Courts have consistently concluded that where a plaintiff alleges a "single scheme" and any predicate act is barred under the PSLRA, the entire RICO claim is precluded. *See In re Libor-Based Financial Instruments Antitrust Litig.*, 935 F. Supp.2d 666, 730 (S.D.N.Y. 2013); *Gilmore v. Gilmore*, No. C09-6230, 2011 WL 3874880, at *4 (S.D.N.Y. Sept. 1, 2011), *aff'd*, 503 Fed. Appx. 97 (2d Cir. 2012) (where defendants' acts were part of a single fraudulent scheme, plaintiff could not divide the scheme into its component parts, as "such surgical presentation . . . would undermine the Congressional purposes" behind the RICO amendment).

In light of the PSLRA, the Court must examine whether Perkumpulan's RICO claim is based on conduct of the type that would have been actionable as fraud in the purchase or sale of securities. A review of Plaintiff's allegations, accepted as true, demonstrates that Perkumpulan seeks to recover RICO's "bonanza of treble damages" and attorneys' fees for conduct that Congress expressly sought to remove from the statute's reach. *See Bald Eagle*, 189 F.3d at 330.

### 1.   The Investment Contracts Constitute Securities

The Court first determines whether Plaintiff's claim involves "securities" in the specific sense of the term. Under United States securities laws, an "investment contract" is delineated a security. *See S.E.C. v. Edwards*, 540 U.S. 389, 393 (2004); 15 U.S.C. §§ 77b(a)(1), 78c(a)(10).

The definition of an investment contract is "a flexible rather than a static principle, one that is capable of adaption to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Edwards*, 540 U.S. at 393 (quoting *S.E.C. v. W.J. Howey, Co.*, 328 U.S. 293 (1946)). The Ninth Circuit has distilled the Supreme Court's definition of an investment contract into a three-part test requiring "(1) an investment of money (2) in a common enterprise (3) with the expectation of profits induced by the efforts of others." *S.E.C. v. Rubera*, 350 F.3d 1084, 1090 (9th Cir. 2003) (Congress did not intend the definition of security to be restrictive, but defined the term "sufficiently broadly to encompass virtually any instrument that might be sold as an investment"); *see S.E.C. v. R.G. Reynolds Enters., Inc.*, 952 F.2d 1125, 1130 (9th Cir. 1991).

Here, Perkumpulan itself argues that the Dressel fraud involved "securities." (Dkt. No. 412 at 17) ("the [Dressel] defendants executed a United States-based RICO conspiracy that involved a securities fraud abroad"). Nor could there be any dispute that the solicited investments in the instant scheme constitute securities as subject to the United States securities laws. Plaintiff's complaint alleges that its defrauded members (1) invested money (2) in one of two funds run by the Dressel enterprise, known as the "SPORTSMANS" and "GMP" funds, (3) upon the promise of receiving between twenty-four and twenty-eight percent returns and while relying upon the misrepresented experience and expertise of Dressel's managers. (*See* Dkt. No. 381 at ¶¶ 1.1–1.2, 3.5–3.13, 4.3–4.34.) Each time an investor did so, Dressel issued an investment certificate out of one of its administrative offices in the United States or Asia. (*Id.* at ¶¶ 4.6, 4.9.) Based on these allegations in the complaint and Plaintiff's own concessions, the Court is satisfied that Dressel's investment certificates were "securities."

### 2.    Plaintiff Relies on Conduct Actionable as Securities Fraud

The Court next addresses whether the defendants' alleged conduct "would have been actionable as fraud in the purchase or sale of securities." 18 U.S.C. § 1964(c). Courts making this determination often turn to section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5

1   to provide the basic guideposts of such an analysis. Those authorities make it "unlawful for any

2   person . . . [t]o use or employ, in connection with the purchase or sale of any security," "any

3   device, scheme, or artifice to defraud." *See* 15 U.S.C. § 78j(b); *S.E.C. v. Zandford*, 535 U.S. 813

4   (2002); *In re Libor-Based Financial Instruments Antitrust Litig.*, 935 F. Supp. 2d 666, 726

5   (S.D.N.Y. 2013) (the SEC may assert a cause of action for securities fraud [under Rule 10b-5] if

6   it alleges that the defendant: "(1) made a material misrepresentation or a material omission as to

7   which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection

8   with the purchase or sale of securities"). The Supreme Court has endorsed a "broad reading" of

9   the phrase "in connection with," holding that "it is enough that the scheme to defraud and the

10  sale of securities coincide." *Zandford*, 535 U.S. at 820; *see Rezner v. Bayerische*

11  *HypoUndVereinsbank AG*, 630 F.3d 866, 871–72 (9th Cir. 2010). Ultimately, whether

12  Perkumpulan itself could bring a successful claim subject to the securities laws is irrelevant. The

13  appropriate inquiry is whether the conduct alleged is of the type generally actionable under the

14  securities laws. *See, e.g.*, *Howard*, 208 F.3d at 749 (affirming dismissal under RICO Amendment

15  where plaintiffs conceded that they had no standing to pursue securities fraud claim); *MLSMK*

16  *Inv. Co. v. JP Morgan Chase & Co.*, 651 F.3d 268, 277 (2d Cir. 2011) ("We conclude that

17  section 107 of the PSLRA bars civil RICO claims alleging predicate acts of securities fraud, even

18  where a plaintiff cannot itself pursue a securities fraud action against the defendant.").

19        Here, Defendants' alleged conduct is of the type generally actionable under the United

20  States securities laws and "would have been actionable" under RICO if not for the PSLRA. *See*

21  18 U.S.C. § 1964(c). In its complaint, Plaintiff specifically alleges that the RICO Defendants

22  made "material misrepresentations" to investors (a) at multiple in-person meetings in Indonesia;

23  (b) through hard-copy brochures provided to investors; and (c) through its website, e-mails, and

24  letters mailed to investors and to WBG, which were then passed on to investors. (*See* Dkt. No.

25  381 at ¶¶ 1.2, 4.5, 4.7, 4.13–4.31, 4.42, 4.50, 4.52–4.58, 4.62–4.65, 6.3, 6.5.) The

26  misrepresentations included statements regarding the false qualifications of the Dressel

managers, the expected returns on the funds, the types of investments that were to be made with

investors' money, and the fact that the investment schemes were legitimate. (*Id.* at ¶¶ 4.5, 4.7,

4.13–4.31.) Perkumpulan further alleges that the RICO Defendants had a fiduciary duty to

provide truthful information and manage the investors' funds as fiduciary agents, (*see id.* at ¶

4.6), and that each Defendant acted with the requisite scienter—that is, that "[i]n making these

misrepresentations, the Ponzi Scheme Defendants intended to deceive [investors] by making

them believe that Dressel BVI was a legitimate investment program and that the Dressel

directors had the qualifications they claimed to have." (*Id.* at ¶ 6.5; *see id.* at ¶ 6.9.) Finally,

Plaintiff's allegations make clear that these fraudulent statements were made at the very time that

Defendants induced individuals into investing and afterwards, so as to perpetuate and

subsequently hide the scheme. Indeed, Plaintiff alleges that the fraudulent statements were made

for the *purpose* of inducing individuals to invest in this "classic Ponzi scheme."[6] (*Id.* at ¶¶ 1.2,

4.4, 4.7–4.8, 4.32, 6.5.) The Court accordingly concludes that Perkumpulan alleges conduct that

(a) is generally actionable as fraud in the purchase or sale of securities and (b) would have been

actionable under civil RICO as fraud in the purchase or sale of securities prior to the PSLRA's

enactment. Plaintiff may not rely on such conduct to support its RICO claim.[7]

---

[6] For example, Plaintiff explains it its complaint that one investor, Halim Chandra, learned of the investment opportunity in August 2004. After being assured that the investment funds were "legitimate" and reviewing the Dressel brochures and website, Mr. Chandra "relied on the affirmative misrepresentations" contained in the brochure and website and decided to invest $60,000 in the SPORTSMAN fund. He then signed the "Portfolio Management Agreement for Strategic Portfolio Management Scheme" and received an investment certificate. (Dkt. No. 381 at ¶ 4.32.) Thus, by Plaintiff's own allegations, investors relied upon fraudulent misrepresentations in deciding to *purchase* the investments Dressel was selling.

[7] Additionally, Plaintiff may not rely on the remaining predicate acts that it alleges—money laundering; distributing the proceeds of unlawful activity; engaging in monetary transactions in property derived from specified unlawful activity; interstate and foreign travel in aid of racketeering enterprises; and transportation and concealment of stolen moneys—because it expressly alleges that all of this conduct was undertaken to keep the Ponzi scheme going. (Dkt. No. 6.14–6.19.) Courts have repeatedly found that the RICO amendment "bars RICO claims based on conduct that perpetuates a Ponzi scheme." *Picard v. Kohn*, 907 F. Supp. 2d 392, 398 (S.D.N.Y. 2012); *see Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.*, 189 F.3d 321, 330 (3d Cir. 1999) (concluding that "[a] Ponzi scheme . . . continues only so long as new investors can be lured into it so that the early investors can be paid a return on their 'investment.' Consequently, conduct undertaken to keep a securities fraud Ponzi scheme alive is conduct undertaken in connection with the purchase and sale of securities."); *MLSMK*, 651 F.3d at 277 n.11 (quoting *Bald Eagle* with approval).

1    To avoid this conclusion, Perkumpulan argues that its hypothetical securities fraud claim

2    would be legally insufficient—and thus, not "actionable" in its eyes—under the Supreme Court's

3    decision in *Morrison v. Nat'l Australia Bank, Ltd.*, which established that § 10(b) of the

4    Securities Exchange Act does not apply extraterritorially. 561 U.S. 247 (2010). The thrust of the

5    argument is that while Defendants allegedly committed a domestic RICO violation,[8] the

6    predicate acts upon which that claim is based constitute *extraterritorial* securities fraud—*i.e.*,

7    fraud for which neither Perkumpulan nor the S.E.C. could obtain relief under the securities laws

8    in light of *Morrison*. Upon review of Plaintiff's argument and additional research, the Court

9    finds this reading of the RICO Amendment and *Morrison* unpersuasive.

10    The only other court to address this issue persuasively rejected the same argument as

11    contrary to the language and purpose of the statute. In *Picard v. Kohn*, the plaintiff-trustee

12    brought a RICO claim against foreign defendants that allegedly played a role in Bernie Madoff's

13    infamous Ponzi scheme. Like Perkumpulan, the trustee sought to avoid the PSLRA's clear

14    preclusion of securities fraud, arguing that "the Securities Exchange Act [under *Morrison*], and

15    thus the RICO amendment, does not apply to financial products that, like those the defendants

16    sold here, did not trade on an American exchange." 907 F. Supp. 2d 392, 399 (S.D.N.Y. 2012).

17    The trustee reasoned that "even though he can neither prosecute foreign securities fraud nor base

---

18

19    [8] The Court now questions this premise. There is a certain irony to Perkumpulan's argument that
20    Defendants' predicate acts are "extraterritorial," given that it previously argued that its "wire fraud" predicate acts
      were sufficiently domestic to survive an extraterritoriality challenge. In a previous Order, the Court denied a motion
21    to dismiss Plaintiff's complaint on extraterritoriality grounds. (Dkt. No. 169.) In doing so, the Court declined to rely
      on *Morrison* and instead examined whether the alleged predicate acts, such as wire fraud, were extraterritorial in
22    nature under *Pasquantino v. United States*, 544 U.S. 349 (2005). The Ninth Circuit subsequently clarified in *United
      States v. Xu*, 706 F.3d 965 (9th Cir. 2013), that RICO does not apply extraterritorially in light of *Morrison*. Under
23    *Xu*, the Court is directed to analyze the "focus" of the RICO claim to determine whether its application is
      extraterritorial, which is the *pattern* of racketeering activity. Such an analysis is in direct contrast to the analysis of
24    whether the predicate acts themselves are extraterritorial in nature. Under the appropriate analysis, where a fraud is
      predicated on extraterritorial activity, it is beyond RICO's reach even if proceeds of the fraud ultimately reach the
      United States. *Xu*, 706 F.3d at 978. In light of *Xu* as intervening authority, the Court need not accept as law of the
25    case its previous holding regarding the domestic nature of the Dressel Ponzi scheme. Because the Court finds
      Plaintiff's RICO claim to be barred under the PSLRA, however, it sees no need to revisit the extraterritoriality issue.
26    Instead, the Court notes its skepticism that Plaintiff's claims would be sufficiently "domestic" to state a claim in
      light of *Morrison* and *Xu*.

ORDER
PAGE - 16

1   a RICO claim on domestic securities fraud [under the PSLRA], he can base a RICO claim on the

2   prosecution of foreign securities fraud." *Id.* Judge Rakoff rejected this argument outright,

3   explaining that the plaintiff's approach would result in a "RICO exception to the Exchange Act's

4   territorial reach, allowing artfully pled prosecution of foreign conduct that constitutes securities

5   fraud whenever such conduct potentially relates to alleged RICO enterprise activity occurring in

6   the United States." *Id.* Such an exception would be implausible and "too clever by half," the

7   court concluded, because it would "in many cases allow artful pleading to eviscerate either the

8   territorial reach of the Securities Exchange Act or the purpose of the 'RICO Amendment' to the

9   PSLRA." *Id.*

10        This Court is in agreement with the *Picard* court's reasoning. The PSLRA explicitly

11   removes securities-fraud type *conduct* from the civil RICO arsenal,[9] regardless of whether the

12   plaintiff or the S.E.C. could successfully pursue a securities fraud *claim* based on the same

13   alleged conduct. *See MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 651 F.3d 268, 275 (2d Cir.

14   2011) ("when Congress stated that 'no person' could bring a civil RICO action alleging conduct

15   that would have been actionable as securities fraud, it meant just that . . . It did not mean 'no

16   person except one who has no other actionable securities fraud claim.'") (citation omitted);

17   *Howard*, 208 F.3d at 749. It is of no moment that Plaintiff believes its securities claims would

18   fail under *Morrison*. The reason is that the securities laws are better suited to the task of

19   providing or precluding a cause of action and remedy for securities fraud. *See MJK Partners*,

20   877 F. Supp. at 603 ("Congress reasoned [that] securities laws generally provide an adequate

21

22

23       [9] The PSLRA House Report contained the following title for section 107, the RICO Amendment: "Inapplicability of [RICO] to Private Securities Actions." H.R. Conf. Rep. No. 104–369, at 47 (1995), *reprinted in*

24   1995 U.S.C.C.A.N. 730, 747. Numerous courts have noted that Congress's intent was "to eliminate securities fraud as a predicate act of racketeering in a civil RICO action." *See MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 651

25   F.3d 268, 275 (2d Cir. 2011); *Fezzani v. Bear, Stearns & Co.*, No. 99 Civ. 0793, 2005 WL 500377, 2005 U.S. Dist. LEXIS 3266 (S.D.N.Y. Mar. 2, 2005) (accepting argument, which was later approved in *MLSMK*, 651 F.3d at 279,

26   that it "was Congress's intention that the applicability of the RICO amendment to a plaintiff's civil RICO claim would not depend on the plaintiff's ability to bring a private securities law action[.]").

remedy for securities fraud[.]"). Thus, in cases where plaintiffs have sought to avoid the RICO

Amendment by alleging only "aiding and abetting" type securities fraud as a RICO predicate

act—which if brought under the securities laws, would fail to state a claim—courts have refused

to allow such artful pleading as a way of obtaining RICO's treble damages. *See MLSMK*, 651

F.3d at 277 n.11. One court explained its reasoning in a way that is particularly applicable to

situation at hand:

> It would be strange indeed if Congress, in a statute that otherwise bars private
> causes of action under RICO for predicate acts that describe conduct actionable as
> securities fraud, nevertheless chose to allow enhanced RICO remedies—treble
> damages and attorneys' fees—against *only* the very parties that Congress
> simultaneously made immune from private suit under the securities laws.

*Thomas H. Lee Equity Fund, LP v. Mayer Brown, Rowe & Maw LLP*, 612 F. Supp. 2d 267

(S.D.N.Y. 2009) (emphasis in original). It would be similarly strange and inappropriate to permit

Perkumpulan to invoke RICO's civil cause of action for extraterritorial securities fraud when the

securities laws themselves do not make such a claim available.[10]

In the course of its argument, Perkumpulan asserts that in the above cases, the S.E.C.

could have brought an action, whereas here, the S.E.C. would also be precluded from initiating

an enforcement action given the extraterritorial nature of the conduct. In making this argument,

Perkumpulan urges the Court not to rely on the Second Circuit's decision in *MLSMK Inv. Co. v.*

*JP Morgan Chase & Co.*, 651 F.3d 268 (2d Cir. 2011). In that case, the Court addressed the

question of whether the PSLRA bar "applies to claims based on conduct that could be actionable

under the securities laws even when the [particular] plaintiff cannot bring a cause of action under

the securities laws[.]" *MLSMK*, 651 F.3d at 274 (quotations omitted). There, the plaintiff based

its RICO claim on conduct that was not actionable under the securities laws by a private plaintiff,

---

[10] Plaintiff's proffered approach would also be "precisely the opposite" of the purpose underlying the RICO
Amendment, which sought to completely eliminate the use of securities fraud in RICO actions. *See* GREGORY P.
JOSEPH, CIVIL RICO: A DEFINITIVE GUIDE 122–23 (2010). This is because Plaintiff's argument would create a
loophole to "expand, rather than restrict, the use of securities claims as predicate acts." *Id.*

1  since the conduct was merely "aiding and abetting" securities fraud. *Id.* Notwithstanding that

2  fact, the Second Circuit concluded in a thorough analysis that the PSLRA "bars civil RICO

3  claims alleging predicate acts of securities fraud, even where a plaintiff cannot itself pursue a

4  securities fraud action against the defendant." *Id.* at 277. The Court also rejected the plaintiff's

5  argument that its RICO claim was necessarily permissible under the PSLRA because a securities

6  claim based on the defendant's conduct would not withstand a 12(b)(6) analysis under a specific

7  securities fraud theory. *Id.* n.11. The Court's decision in *MLSMK* did not depend solely on the

8  fact that the S.E.C. could have successfully brought the securities fraud claim.

9      Perkumpulan's argument is a red herring. First, the Court has not relied on the specific

10 holding of *MLSMK,* but merely discussed it among numerous other cases for the basic

11 propositions in the "RICO Amendment" context. Furthermore, Plaintiff's conclusion would be

12 unavailing even if the Court adopted its proposed approach and determined that its ability to

13 bring a securities-fraud-based RICO claim depended on *Morrison*'s extraterritoriality analysis. In

14 its attempt to shoehorn a securities fraud claim into its RICO cause of action, Perkumpulan fails

15 to note that after the Supreme Court decided *Morrison*, Congress expressly sought to preserve

16 the S.E.C.'s enforcement authority as it relates to extraterritorial securities fraud. *See S.E.C. v.*

17 *Tourre*, No. C10-3229, 2013 WL 2407172, at *1, 4 (S.D.N.Y. June 4, 2013) (noting that the

18 Dodd-Frank Act "effectively reversed *Morrison* in the context of SEC enforcement actions" and

19 declining to require a *Morrison* analysis for fraudulent conduct that occurred after the Dodd-

20 Frank Act was passed); *S.E.C. v. Gruss*, No. C11-2420, 2012 WL 3306166, at *3 (S.D.N.Y. Aug.

21 13, 2012) ("Section 929P(b) of the Dodd–Frank Act allows the SEC to commence civil actions

22 extraterritorially in certain cases."); 15 U.S.C. § 77v(c). Thus, it appears that its claims would be

23 "actionable" as fraud in the purchase or sale of securities by the S.E.C. even if the Court were to

24 engage in Plaintiff's proposed analysis.

25      Finally, whether the S.E.C. could prevail is beside the point. As explained above (and

26 even in *MLSMK*), the PLSRA analysis does not depend on whether one could ultimately prevail

on a securities fraud claim under a Rule 12(b)(6)-style analysis. Instead, the question is whether the conduct alleged is of the type generally actionable under the securities laws—that is, whether it is conduct that involved fraud in connection with the purchase or sale of securities. *MLSMK*, 651 F.3d at 278 (discussing legislative history and explaining that "Congress did not say that it was removing 'any *claim* that would have been actionable'") (emphasis in original). The fact that Plaintiff or the S.E.C. could not ultimately succeed on a securities claim against Defendants does not in turn salvage their RICO claim, which is unquestionably premised upon "fraud made in connection with the purchase and sale of securities" under even the most basic definition of securities fraud. *Cf. id.* at 280. Ultimately, Perkumpulan's proffered approach is contrary to the purpose of the RICO Amendment, would expand rather than limit the use of securities fraud in the RICO context, and has been persuasively rejected by another court faced with the same argument. The Court thus finds Plaintiff's distinction to be unpersuasive.

Because Perkumpulan cannot rely on the conduct of Defendants it has alleged to support its RICO cause of action, it cannot state a valid claim under the statute. The Court does not believe that allowing Plaintiff to file another amended complaint is necessary, since under any internally consistent set of facts, the alleged scheme was one based upon securities fraud. *Swartz*, 476 F.3d at 761; *see Albrecht v. Lund*, 845 F.2d 193, 195 (9th Cir. 1988) (if "the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency, then . . . dismissal without leave to amend is proper.") (internal quotation, citation omitted). Section 107 of the PSLRA thus requires that Plaintiff's RICO claim be dismissed with prejudice.

### C.    Plaintiff's Remaining State Law Claims

"Courts have an independent obligation to determine whether subject-matter jurisdiction exists." *Hertz Corp. v. Friend,* 559 U.S. 77, 95 (2010). Federal subject matter jurisdiction exists only when a controversy involves diversity of citizenship between the parties or a question of federal law. *See* 28 U.S.C. §§ 1331, 1332(a)(1)–(4). Plaintiff's operative complaint premises the

Court's jurisdiction on its federal claim and the Court's supplemental jurisdiction.[11] (Dkt. No. 381 at ¶ 2.1.) Because the Court no longer has any basis to exercise federal question jurisdiction, the Court declines to exercise supplemental jurisdiction over Perkumpulan's remaining state law claims. *Ove v. Gwinn*, 264 F.3d 817, 826 (9th Cir. 2001) ("A court may decline to exercise supplemental jurisdiction over related state-law claims once it has dismissed all claims over which it has original jurisdiction."). The Court accordingly dismisses Plaintiff's remaining state-law claims without prejudice.

**D.      The Parties' Motions for Sanctions**

      **1.      Jared Sherer's and Perkumpulan's Sanctions Motions (Dkt. Nos. 485, 499)**

In the course of discovery, Defendant Jared Sherer filed a motion for sanctions against Perkumpulan and its counsel. According to Mr. Sherer, Plaintiff and its counsel violated the automatic stay that arose when he re-opened his bankruptcy proceeding in the United States Bankruptcy Court for the District of Utah by seeking discovery from him, notwithstanding his active litigation of this matter. (Dkt. No. 499.) Plaintiff asserts in its response and its own motion to compel and for sanctions (Dkt. No. 485) that Mr. Sherer's contention is frivolous. As Plaintiff explains, the Ninth Circuit has held that re-opening a previously closed Chapter 7 bankruptcy proceeding does not re-instate the automatic stay that accompanies an initial filing. *In re Menk*, 241 B.R. 896, 914 (9th Cir. 1999) ("[T]o the extent that the automatic stay expired in conjunction with closing, it does not automatically spring back into effect. If protection is warranted after a case is reopened, then an injunction would need to be imposed.") Additionally, Plaintiff asserts that Mr. Sherer's alleged conduct post-dates his bankruptcy discharge, rendering

---

[11] Even if Plaintiff attempted to base its lawsuit on the Court's diversity jurisdiction, the Court would find that jurisdiction was lacking. This is because Perkumpulan, as a foreign plaintiff, is suing foreign defendants. *See Mutuelles Unies v. Kroll & Linstrom*, 957 F.2d 707, 712 (9th Cir. 1992) ("Diversity jurisdiction does not encompass foreign plaintiffs suing foreign defendants."); *Faysound, Ltd. v. United Coconut Chems., Inc.*, 878 F.2d 290, 294 (9th Cir. 1989) (no complete diversity where an alien plaintiff sues an alien defendant, even if there are citizen defendants present).

any bankruptcy stay immaterial. *See Partners for Health and Home, L.P. v. Yang*, 488 B.R. 109, 119 (C.D. Cal. 2012) ("A bankruptcy discharge cannot discharge liabilities for acts that the debtor committed or continued post-petition, or at least post-discharge."). In light of the foregoing, Perkumpulan requests that the Court compel Jared Sherer to respond to certain discovery requests and pay for Plaintiff's attorneys' fees and costs associated with the motion to compel. (Dkt. No. 485.)

The Court declines to sanction either party and declines to resolve the motion to compel in light of the Court's ruling herein on the Sherers' motion to dismiss. As an initial matter, the Court agrees with Plaintiff that Mr. Sherer's bankruptcy re-opening has not worked to automatically stay this action. Nor would the principal allegations against Mr. Sherer implicate the stay even if the re-opening did renew the automatic stay, since they focus on conduct that post-dates Mr. Sherer's bankruptcy discharge. In light of these conclusions, the Court does not believe that sanctions against Plaintiff or Plaintiff's attorneys are warranted. But similarly, the Court finds unnecessary sanctions against Mr. Jared Sherer. The Court has declined to resolve the pending motion to compel in light of its ruling that Plaintiff's complaint must be dismissed for failure to state a claim. Absent a ruling that Mr. Sherer failed to comply with his discovery obligations, the Court has no basis to award the fees incurred in filing the motion to compel under Rule 37. If Plaintiff chooses to pursue its state law claims in state court, it may engage in discovery in accordance with the rules thereof. Should Mr. Sherer fail to participate in good faith, the presiding Judge may deal with his refusals accordingly. The motions for sanctions (Dkt. Nos. 485, 499) are denied.

### 2.   Perkumpulan's Motion for Sanctions Against Defendants Kenneth McCabe, Michelle Sherer, and Donald Sherer (Dkt. No. 487)

Perkumpulan also requests that the Court sanction Defendants Kenneth McCabe, Donald Sherer, and Michelle Sherer pursuant to Rule 37(g)(2)(A) by striking their answers and motions to dismiss and entering default against them. (Dkt. No. 494.) As Plaintiff points out, this Court previously ordered Kenneth McCabe and the Sherers to respond to discovery requests that they

1   ignored and to show cause why they should not have to pay for the fees and costs Plaintiff

2   incurred in filing the motion to compel. (Dkt. No. 317.)  Following that Order, Mr. McCabe

3   produced nothing. (Dkt. No. 487 at 3.) Instead, Plaintiff points out, Mr. McCabe continued to

4   insist that he had no e-mails or documents to produce and failed to respond to the Court's show

5   cause order. (*See id.*) The Sherers, then represented by counsel, did respond to the show cause

6   order. Counsel explained that it took him time to get up to speed on the case, that the motion to

7   compel could have been avoided, and that the Sherers provided the discovery responses at issue

8   as ordered by the Court. (Dkt. No. 323.)

9          Perkumpulan explains in the instant motion that Mr. McCabe has continued to stonewall

10  its discovery efforts. While the Sherers did produce some documents following the motion to

11  compel, Perkumpulan believes that the Sherers did not make a full production in good faith and

12  have failed to complete production of additional responsive documents. Perkumpulan also

13  highlights what it believes to be the Sherers' "ongoing pattern of misconduct," which include:

14  (1) the Sherers' failure to respond to Perkumpulan's discovery requests until faced with a motion

15  to compel; (2) the Sherers' failure to produce documents in response to the same; (3) the Sherers'

16  filing of procedurally improper motions to dismiss; (4) Donald Sherer's engaging in improper

17  representation of his son, Jared, when both parties are proceeding *pro se*; (5) the Sherers' making

18  of "hundreds of changes" to their deposition transcripts; (6) the Sherers' filing of an improper

19  surreply; and (7) the Sherers making a "bad faith attempt to remove Plaintiff's Alaska state-court

20  action" to the federal district court in Utah.

21          "If a party . . . fails to obey an order to provide or permit discovery," the Court may

22  impose sanctions, including the payment of expenses and attorneys' fees, "striking pleadings in

23  whole or in part," or "rendering a default judgment against the disobedient party." FED. R. CIV.

24  P. 37(c)(1). "Where the sanction results in default, the sanctioned party's violations must be due

25  to the willfulness, bad faith, or fault of the party." *Hester v. Vision Airlines*, 687 F.3d 1162, 1169

26  (9th Cir. 2012). The Ninth Circuit has explained that default judgment is a "harsh penalty" to be

1   imposed "only in extreme circumstances." *Id.* (citation omitted). Accordingly, a court must

2   consider five factors before striking a pleading or declaring default as a sanction for discovery

3   violations:  "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to

4   manage its docket; (3) the risk of prejudice to the other party; (4) the public policy favoring the

5   disposition of cases on their merits; and (5) the availability of less drastic sanctions." *Id.* (citation

6   omitted).

7          The Court is not satisfied that striking the pleadings and entering default against Mr.

8   McCabe and the Sherers is warranted. With regard to Mr. McCabe, the Court takes note that

9   while Mr. McCabe is steadfast in his assertion that he has no documents to produce—an

10  argument Plaintiff believes to be false—the parties did discuss the possibility of allowing

11  Plaintiff to search Mr. McCabe's e-mails to prove his assertion but failed to reach agreement on

12  the matter. (Dkt. No. 494 at 3.) As Plaintiff admits, Mr. McCabe would not allow *Plaintiff* to

13  conduct the search, but did indicate his willingness to allow a lawyer or other third-party to

14  review his e-mails and attest that none of the requested communications were present. In its

15  reply, Plaintiff faults Mr. McCabe for "never commission[ing] such a search." (*Id.*) But it is not

16  clear from the parties' briefing whether Plaintiff itself ever sought to take Mr. McCabe up on this

17  offer. While the Court shares Plaintiff's concern about Mr. McCabe's lack of responsiveness,

18  these very facts belie its argument that default is the *only* appropriate sanction. Mr. McCabe has,

19  at a minimum, offered to cooperate with Plaintiff in some fashion so as to move the case along.

20  Permitting Plaintiff to take a default judgment against Mr. McCabe that could render him liable

21  for hundreds of millions of dollars is simply too strong a sanction for his failure to comply with

22  the Court's previous order. Such an unreasonable sanction is made all the worse in light of the

23  Court's ruling herein that Plaintiff has failed to state a claim for a RICO violation. Because Mr.

24  McCabe has not been subject to less drastic sanctions for his alleged conduct, because a

25  disposition of the case on the merits is preferable, and because a default would subject Mr.

26  McCabe to a disproportionately harsh sanction for the alleged conduct, the Court declines to

1    sanction Mr. McCabe by striking his pleadings and entering default against him. *See Hester*, 687

2    F.3d at 1169. Because the Court previously granted Plaintiff's motion to compel discovery

3    responses from Mr. McCabe and he failed to respond to the Court's order to show cause,

4    however, Mr. McCabe shall pay Plaintiff's reasonable attorneys' fees incurred in bringing that

5    motion to compel. (*See* Dkt. No. 317.) Plaintiff shall submit within fourteen (14) days proof of

6    its reasonable attorneys' fees for that motion.

7            The Court now turns to the Sherers' conduct. Unquestionably, they have failed to follow

8    local rules and their filings leave much to be desired. However, much of the conduct

9    Perkumpulan points to is *not* subject to Rule 37's authority for sanctions, which deals with a

10   party's failure to comply with a Court's discovery order. Some of the conduct does not even

11   involve this lawsuit, but instead refers to the Sherers litigation tactics in other matters. With

12   regard to the Sherers' discovery responses, which is the only conduct at issue here, their then-

13   counsel responded to the Order to Show Cause, explained the failure, and indicated that the

14   responses had been produced to Plaintiff. Now, in the instant motion, Plaintiff reiterates its belief

15   that the productions are not complete and requests that the Court sanction the Sherers by striking

16   their pending motions to dismiss and entering default against them. The Court declines to do so

17   upon consideration of the *Hester* factors. Namely, the Sherers undisputedly complied in part with

18   the Court's order to produce documents, though the parties remain in dispute as to whether that

19   production was complete. Even assuming that the production as not complete, however, the

20   Court notes that it has not yet required the Sherers to pay monetary fines, the default judgment

21   would be excessive given the award that Plaintiff seeks in this case, and as discussed above, the

22   Court has concluded that Plaintiff's complaint fails to state a claim as a matter of law. In light of

23   these factors, the Court cannot say that the Sherers' conduct, as frustrating, unprofessional, and

24   difficult it may be, warrants striking their motions to dismiss and subjecting them to a default

25   judgment.

26   //

**E.     Perkumpulan's Motion to Seal (Dkt. No. 526)**

Finally, Perkumpulan requests that the Court seal exhibits K, P, Q, and Z, which it filed in opposition to Defendant Dwight Williams' motion for summary judgment and in support of its own motion for partial summary judgment. (Dkt. No. 526.) The documents at issue were marked "Confidential" or "Highly Confidential" by Regal Financial Bank, a former Defendant in this matter. The Court has not considered any of these documents in the instant ruling given the analysis herein. No party or interested person has opposed or responded the motion.

The Court denies the motion to seal. (Dkt. No. 526.) A party filing documents subject to a stipulated protective order *must* file them under seal, but need not provide a "specific statement of the applicable legal standard and the reasons for keeping a document under seal." Local Rules W.D. Wash. CR 5(g)(3). Instead, the party or interested person must who designated the document confidential must satisfy the rule above and provide evidentiary support from declarations where necessary. *Id.* Here, Perkumpulan filed a motion to seal certain documents that former-Defendant Regal Financial Bank marked "Confidential" or "Highly Confidential." However, it provided no explanation as to why the Court should keep the documents sealed, and no party or other interested person (such as Regal Financial Bank) responded as required under the Local Rules. Under the governing rules, the Court has no basis to seal the documents and will not, *sua sponte*, engage in document review on behalf of the parties—especially when the Court has not relied upon the documents at issue in reaching a dispositive ruling in this case.

Because the Court denies the motion to seal, the documents at issue will be unsealed in seven (7) days absent a request that the materials be withdrawn from the record rather than unsealed. *See* Local Rules W.D. Wash. CR 5(g)(6).

**III.    <u>CONCLUSION</u>**

For the foregoing reasons, the Court rules as follows:

1) The motion to dismiss filed by Defendant Jared Sherer and joined by Michelle and Donald Sherer is GRANTED (Dkt. No. 388) and Plaintiff's RICO claim is DISMISSED with

1  prejudice;

2          2) The Court declines to exercise its supplement jurisdiction over Plaintiff's state law

3  claims and accordingly DENIES as moot the parties' motions relating to those claims (Dkt. Nos.

4  377, 404, 432, 441, 509, 516);

5          3) The Court GRANTS the Sherers' motions to file over-length papers (Dkt. Nos. 429,

6  431) and Michelle Sherer's motion to withdraw (Dkt. No. 440), and STRIKES Michelle Sherer's

7  initial motion to dismiss (Dkt. No. 430);

8          4) The Court DENIES as moot the parties' non-dispositive discovery, service of process,

9  and default-related motions in light of the dismissal of Plaintiff's complaint (Dkt. Nos. 426, 427,

10  457, 477, 506, 538, 544, 546);

11          5) The Court DENIES Perkumpulan's and Jared Sherer's motions for sanctions (Dkt.

12  Nos. 485, 487, 499) except as explained herein with regard to Defendant Kenneth McCabe;

13          6) The Court DENIES Perkumpulan's motion to seal (Dkt. No. 526).

14          DATED this 14th day of March 2014.

15

16

17

18

19

20          _____

21          John C. Coughenour
            UNITED STATES DISTRICT JUDGE

22

23

24

25

26